The COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF THE IOWA STATE BAR ASSOCIATION, Complainant,

v.

William D. BAKER, Respondent.

No. 92–1258.

Supreme Court of Iowa.

Nov. 25, 1992.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

William L. Kutmus of Kutmus and Pennington, P.C., Des Moines, and William D. Baker, pro se, for respondent.

Considered by LARSON, P.J., and SCHULTZ, CARTER, LAVORATO, and NEUMAN, JJ.

LAVORATO, Justice.

Before us is a report of the Grievance Commission recommending that attorney William D. Baker be reprimanded.

The commission found that Baker acted unethically in the following ways: aiding the unauthorized practice of law; permitting others to influence his professional judgment in providing legal services to clients referred to him, resulting in conflicts of interest; and accepting improper referrals.

Baker is a sole practitioner and has practiced law in Des Moines since 1967. He focuses primarily on real estate, probate, estate planning, and trusts.

Rex Voegtlin is a certified financial planner and sole shareholder of Diversified Resource Management, Inc., located in West Des Moines. During 1989 and 1990 Voegtlin was presenting seminars in which he touted living trusts as an estate planning device. (Living or loving trusts have been promoted as a way of avoiding probate.) One of Voegtlin's advertisements concerning these seminars is in evidence. The ad urges people to attend and learn "how to avoid probate and minimize estate taxes with an estate plan that includes a living trust." In a newsletter—also in evidence—Voegtlin condemns probate as too expensive and time consuming.

In 1989 James Miller, a lawyer, was a trust officer for Hawkeye Bank and Trust of Des Moines, a former client of Baker's. In the summer of that year Miller attended one of Voegtlin's seminars and met him for the first time. Sometime after that meeting the two agreed to work jointly in putting on Voegtlin's seminars. Miller's reason for doing so was to attract new business for his bank. The two conducted about eight to ten of these joint seminars from October 1989 to May or June 1990,

when Miller quit. About 90 to 100 people attended the first three or four of these seminars. From that point on attendance fell to about 50 or 60.

Shortly before Miller agreed to these joint seminars, he and Voegtlin met with Baker in August 1989. Miller knew Baker because Baker had previously done work for the bank. Miller and Voegtlin asked Baker if he would accept referrals from them. Baker said he was interested but wanted to have several questions answered. Partly for that reason, Miller and Baker attended a seminar in Colorado to see how a living trust seminar might work.

Thereafter, Miller, on behalf of the bank, and Voegtlin agreed to cosponsor seminars on living trusts. Baker told the two he would accept referrals from them for the preparation of living trusts and related documents, and he began doing so in the fall of 1989.

After Baker agreed to accept referrals from Voegtlin and Miller, he attended one seminar the two put on in October 1989. The seminar dealt generally with estate planning and more specifically with the use of a living trust as a way to avoid probate.

Over time the seminars and referrals developed this way. Voegtlin would advertise a free seminar in which the benefits of a living trust would be explained. Voegtlin and Miller would divide up the time during which each would speak. Voegtlin would close the seminar by offering free individual consultations. Usually about half of those attending would seek individual consultations. They did so by filling out a form giving their names, addresses, phone numbers, and their desire for the consultation. The forms were left with Voegtlin who would then follow up and arrange the consultations.

Before the consultations, these "clients"—as Voegtlin described them—would complete a general information planning form in which they would list their names, addresses, family members, and assets. At the consultations, which were held in Voegtlin's office, the clients would present the form at which point Voegtlin and Miller would review it as well as the clients' goals. The primary goal was, of course, to avoid probate.

Voegtlin and Miller would then talk about the various estate planning options the clients had. They would discuss the living trust in a general way—what it can do and what it cannot do. Voegtlin would diagram on a blackboard how a living trust works. The use of marital trusts, family trusts, and generation-skipping trusts was explained—how they worked and how they fit into an estate plan. The diagram would be individualized to include the clients' beneficiaries by name and the names of the trustees.

Voegtlin would also diagram how a will works so the clients could understand the difference between a living trust and a will. Voegtlin would then take a Polaroid picture of the diagrams and give it to the clients. Miller would talk about the duties of a bank trustee and what a bank does on a day-to-day basis when acting as a trustee.

Eventually during the consultations, Voegtlin, Miller, and the clients would reach a consensus as to which estate plan was best for the clients. By this time Voegtlin and Miller had made a determination as to which documents would be necessary to carry out the estate plan.

At this point Voegtlin and Miller would tell the clients that the clients needed to employ a licensed attorney to prepare the documents. If the clients had an attorney, the two would suggest that the clients' attorney be employed. If the clients had no attorney, the two would give the clients a list of attorneys to consider. Baker was among those attorneys listed. The two told the clients that most clients chose Baker because he was a competent attorney, his fees were reasonable, and he was prompt. The evidence shows that from October 1989 through October 1991, Baker accepted about 100 of these referrals. Fewer than ten were received by other attorneys.

Frequently Voegtlin would telephone Baker during the consultations. Voegtlin would tell him that the clients who were there wanted to proceed with the living

trust and wanted him to do the legal work. Voegtlin would use a speaker phone so that the clients could also talk to Baker. Voegtlin would remain and listen to the conversation.

Sometimes Voegtlin would not follow this procedure. Instead Voegtlin or Miller would bring the materials discussed at the consultations to Baker and ask if he would accept the referral. A few times clients themselves would go to Baker's office with the materials. The materials would include (1) a copy of the financial form, (2) a general outline of the terms to be included in the clients' living trust, and (3) a description of other necessary documents.

Baker would then call the clients to go over their materials and discuss any questions that either he or they might have. Baker would ask if they were still interested. Some were; others were not. If the clients expressed an interest in proceeding, Baker would tell them that he would prepare a draft of what they wanted and send the draft to them for their review. If the clients did not proceed, Baker would not charge them for any work he might have done for them.

If the clients wanted to proceed, Baker would tell them to bring the trust documents to a meeting at Voegtlin's office. At the meeting Baker would go through the documents and explain them to the clients. Voegtlin was often, but not always, at these meetings. The clients executed the documents at these meetings unless corrections were necessary. If corrections were necessary, the corrections were made and the documents were either executed then or later.

There were times when the clients met Baker at his office. Those times occurred when the clients did not want to involve Voegtlin or the bank.

Not surprisingly, the documents frequently named Voegtlin or Diversified as the person to fund the trust. Voegtlin's wife—also a certified financial planner—usually performed this task. Funding the trust simply means having the clients sign whatever forms or documents that are necessary to transfer personal property from the clients' names to the living trust. Voegtlin's fee for funding the trust and financial advice related to this task was $1000. The advice, for example, might include recommending exchanging a low-interest producing asset for a higher-interest producing one.

In May 1990 Voegtlin asked Baker to furnish him with a sample living trust and accompanying documents that Baker was using for the clients Voegtlin and Miller were referring to him. Voegtlin told Baker he wanted sample documents to show clients who were interested in seeing what Baker's trust looked like. Voegtlin apparently used these documents in his seminars.

The sample living trust and the accompanying documents are in evidence. The accompanying documents included a "Declaration of Trust Ownership," a "Power of Attorney," a "Special Power of Attorney," an "Anatomical Gift," a "Declaration Relating to [the] Use of Life–Sustaining Procedures," a "Petition for Appointment of Guardian (Standby)," a "Declaration of Gift Memorandum," and a "Supplemental Financial Planning Letter." Miller's bank is named in the power of attorney form. The special power of attorney form designates Voegtlin as the attorney-in-fact. The supplemental financial planning letter contains, among other provisions, the following:

*Financial Planner: This document and related instruments were recommended by Mr. Rex Voegtlin, Certified Financial Planner and Registered Investment Adviser.* He was instrumental in developing a financial and investment framework for my living will as well as death estate. Since Mr. Voegtlin is familiar with my financial planning goals, it is my wish that you notify him upon my demise to help coordinate a smooth financial transition of my invested estate. His address is 1415 28th Street, Suite 110, West Des Moines, Iowa 50265.

(Emphasis added.)

On December 8, 1989, two members of the Commission on the Unauthorized Practice of Law (UPC), a commission estab-

lished by this court, met with Miller, several bank officials, and Baker. The purpose of the meeting was to determine who actually prepared the living trust documents and to discuss certain misleading statements about Iowa probate fees made in the brochure distributed at the seminars. Miller assured the two UPC members that Baker prepared the living trust documents. Baker concurred. Miller also assured them that the attendees at the seminar who were interested in living trusts were urged to use their attorneys. If they had none they were encouraged to use Baker. Finally, Miller assured the two UPC members that he would continue to urge all attendees to use attorneys to review or prepare all legal instruments. Miller agreed to quit distributing the misleading brochures at the seminars.

Several weeks later one of the two UPC members wrote Miller a letter summarizing what Miller had said. The letter also informed Miller that "[i]n light of our discussion the [UPC] anticipates no further formal action at this time."

In July 1990 the Committee on Professional Ethics and Conduct of the Iowa State Bar Association published interpreting opinions 90–1 and 90–2. Formal opinion 90–32 was published in November 1990. The subject of each opinion was the marketing of living trusts. Opinion 90–32 stated that it was improper for Iowa lawyers to participate in living trust programs like those conducted by Diversified. After publication of opinions 90–1 and 90–2, Baker was the only attorney who continued accepting referrals from Voegtlin.

In February 1991 two members of the UPC met with Baker concerning its investigation of Voegtlin and Diversified. At Baker's disciplinary hearing, one of the two investigating UPC members testified this way:

Q. According to Mr. Baker, would he attend the first meeting between the client and Mr. Voegtlin? A. The way I understood the process is Mr. Voegtlin would get the client initially interested at the seminars. Mr. Voegtlin would then meet with the individual without Mr. Baker, another attorney present, and discuss what the client needed, what legal documents would be prepared, whether they need a will, a living trust, guardianship, standby guardianship, a trust. And then Mr. Baker would be called in to draw up the documents, but he was not usually in attendance at that first meeting.

Q. So it was your understanding from Mr. Baker that Mr. Voegtlin would discuss at the initial meeting with the client what types of instruments would be needed? A. Yes, and advise the client what the standard package was and what were the varieties of changes they might need for their particular situation.

. . . .

Q. Would it be fair to say, based on the information that Mr. Baker gave you, that Mr. Voegtlin would tell Mr. Baker specific documents that would be needed in a given situation? A. That was my understanding, that they had sort of a standard package of documents that Mr. Baker indicated were developed early on that he got from Hawkeye Bank when Hawkeye Bank was involved in doing these trusts, that he had modified them in some respects but the basic package of documents Mr. Baker had and then at Mr. Voegtlin's direction would decide we need will A or will B or trust A or trust B or whatever type was needed.

. . . .

Q. ... When does it say Voegtlin's doing this? A. My understanding was that Mr. Voegtlin, when he called Mr. Baker, would tell him that "We need pour-over will A," or, "We need pour-over will B," or, "We need just A or B," and described the client's specific situation and that Voegtlin was giving the legal advice and directing him as to what documents to prepare.

. . . .

Q. When you talked with Mr. Baker about what he might recommend to clients, did he tell you that he merely explained the pros and cons of living trusts to the clients and let them make up their own mind, or did he say that he

recommended living trusts to his clients? ... A. My understanding is by the time that the people got to Mr. Baker that it was a done deal, in that the decisions had already been discussed with Mr. Voegtlin about what they needed, that they needed the living trust, and that he basically then prepared the documents for their signature.

. . . .

Q. Was there any discussion with Mr. Baker as to whether when he got a referral from Mr. Voegtlin he ever recommended anything to them other than the living trust? A. That was one thing I was curious about, is whether as an attorney he was exercising some independent judgment on these clients, and I asked him about that, and he had indicated that he had about 50 to 60 referrals from Mr. Voegtlin over what I understood to be some time period from about 1989, and he indicated he had never suggested to the client that the living trust was not appropriate for their situation.

Baker also told the two UPC investigating members he was worried that he might be aiding in the unauthorized practice of law and might be accepting improper referrals. The two urged Baker to seek an opinion about his concerns from the Committee on Professional Ethics and Conduct.

In March 1991 Baker did write to this committee raising his concerns about opinion 90–32. Baker requested guidance on variations of the scenarios discussed and published in that opinion. Of course, these variations concerned his business referral relationship with Voegtlin.

In May 1991 Baker heard back from the committee. The committee wrote Baker a letter in which it refused to provide him an advisory opinion about his inquiry. This refusal was premised on the rules of the committee, which permit advisory opinions only in "proposed actions of members of the bar." The letter informed Baker that his request was confined to past and/or continuing actions, effectively foreclosing an advisory opinion from that body. The committee, however, did advise Baker that what he described might "involve impro-

priety and should be reviewed." The committee closed by asking for more information. Baker responded shortly thereafter, providing greater details about Voegtlin's referrals to him.

In April 1991 two members of the UPC met with Voegtlin and his attorney about procedures Voegtlin used in recommending living trusts and referring legal matters. The UPC did not make a determination that Voegtlin was involved in the unauthorized practice of law. Apparently, the UPC is delaying its determination because of this disciplinary proceeding against Baker. The UPC has, however, referred the matter to the attorney general's office for investigation of consumer fraud.

The Committee on Professional Ethics and Conduct filed a complaint against Baker in October 1991. The complaint alleges that Baker's involvement with Voegtlin in the living trust marketing scheme violated several disciplinary rules and ethical considerations of the Iowa Code of Professional Responsibility for Lawyers and formal opinion 90–32.

The record made in the hearing before the commission included the complaint, the committee's requests for admission, witness testimony, and exhibits. Baker responded affirmatively to the majority of both requests for admission and testified in his own behalf.

After finding that the allegations of the complaint were true, the commission recommended that Baker be publicly reprimanded for (1) aiding in the unauthorized practice of law; (2) permitting others to influence his professional judgment in providing legal services to clients referred to him, resulting in a conflict of interest; and (3) accepting improper referrals.

■■■ The committee must prove the allegations of the complaint by a convincing preponderance of the evidence. *Committee on Professional Ethics & Conduct v. Lawler*, 342 N.W.2d 486, 487 (Iowa 1984). Although Baker did not appeal, we still review de novo the record made before the commission. Iowa Sup.Ct.R. 118.10. We independently decide the matter and take

appropriate action on it. *Id.* In our review we consider the findings of fact made by the commission but are not bound by them. *Committee on Professional Ethics & Conduct v. Conzett*, 476 N.W.2d 43, 44 (Iowa 1991).

## I. *Aiding in the Unauthorized Practice of Law.*

We first turn our attention to the commission's finding that Baker aided Voegtlin in the unauthorized practice of law. Whether we agree with this finding requires a two step analysis. First, did Voegtlin's actions constitute the unauthorized practice of law? If so, did Baker aid those actions?

A. *Voegtlin's actions.* This court has refrained from attempting an all-inclusive definition of the practice of law. Rather it decides each case in this area largely on its own particular facts. *Bump v. Barnett*, 235 Iowa 308, 315, 16 N.W.2d 579, 583 (1944). EC 3–5 of the Iowa Code of Professional Responsibility for Lawyers takes the same tack: "It is neither necessary nor desirable to attempt the formulation of a single, specific definition of what constitutes the practice of law." EC 3–5.

However, EC 3–5 goes on to tell us what the practice of law includes:

> *However, the practice of law includes,* but is not limited to, representing another before the courts; giving of legal advice and counsel to others relating to their rights and obligations under the law; and preparation or *approval of the use of legal instruments by which legal rights of others are either obtained, secured or transferred* even if such matters never become the subject of a court proceeding. Functionally, the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer. The essence of the professional judgment of the lawyer is his educated ability to relate the general body and philosophy of law to a specific legal problem of a client; and thus, the public interest will be better served if only lawyers are permitted to act in matters involving professional judgment.

Where this professional judgment is not involved, nonlawyers, such as court clerks, police officers, abstracters, and many governmental employees, may engage in occupations that require a special knowledge of law in certain areas. But the services of a lawyer are essential in the public interest whenever the exercise of professional legal judgment is required.

(Emphasis added.)

In short, the practice of law includes the obvious: representing another before the court. But the practice of law includes out-of-court services as well. For example, one who gives legal advice about a person's rights and obligations under the law is practicing law. Or one who prepares legal instruments affecting the rights of others is practicing law. Or one who *approves* the use of legal instruments affecting the rights of others is practicing law.

Practically speaking, professional judgment lies at the core of the practice of law. When lawyers use their educated ability to apply an area of the law to solve a specific problem of a client, they are exercising professional judgment. The phrase "educated ability" in EC 3–5 refers to the system of analysis lawyers learn in law school. They learn to recognize issues first and then how to solve those issues in an ethical manner, using their knowledge of the law. *See* EC 3–2 ("Competent professional judgment is the product of a trained familiarity with law and legal processes, a disciplined, analytical approach to legal problems, and a firm ethical commitment."). The practice of law is no different: lawyers determine what the issues are and use their knowledge of the law to solve them in an ethical way. This is the art of exercising professional judgment.

In contrast, nonlawyers who use their knowledge of the law for informational purposes alone are not exercising a lawyer's professional judgment. For example, an abstracter must have knowledge of what constitutes a lien on real estate. An abstracter uses this knowledge, which is legal in nature, when the abstracter shows the lien in the abstract of title. In doing

so, the abstracter is simply furnishing the title examiner—a lawyer—information that the lawyer needs in advising the client on the marketability of title. In this scenario, the abstracter is simply furnishing information; the title examiner is exercising professional judgment on a legal question. The abstracter is not practicing law; the title examiner is.

■ From the evidence in this case, it is clear that Voegtlin's actions met one of the practicing law tests articulated in EC 3–5: "approval of the use of legal instruments by which legal rights of others are either obtained, secured or transferred." Voegtlin met with the clients. He advised them about what they needed in the way of estate planning. He advised them in particular about what documents they would need and how those documents would need to be tailored to meet their particular situation. In the words of one UPC investigator, by the time the clients got to Baker "it was a done deal." Baker was merely a scrivener. Voegtlin had already made the major decisions; he, rather than Baker, was exercising professional judgment. The "smoking gun" on this point is found in the supplemental financial planning letter. This document acknowledges that the financial planning letter and related instruments were recommended by Voegtlin.

Voegtlin's actions fit neatly into what one court considered to be the unauthorized practice of law:

> Giving legal advice, directly or indirectly to individuals or groups concerning the application, preparation, advisability or quality of any legal instrument or document or forms thereof in connection with the disposition of property inter vivos or upon death, including inter vivos trusts and wills.

*In re the Florida Bar,* 215 So.2d 613, 613–14 (Fla.1968) (per curiam) (petition by state bar and securities broker to determine whether certain activities of securities broker constituted the unauthorized practice of law). We adopt this test as a supplement to EC 3–5 and as an expanded definition of the practice of law.

For all of these reasons, we agree with the commission that Voegtlin was engaged in the unauthorized practice of law.

B. *Baker's actions.* DR 3–101(A) prohibits a lawyer from aiding a nonlawyer in the unauthorized practice of law. EC 3–1 exhorts the legal profession to actively discourage the unauthorized practice of law. EC 3–3 reminds lawyers that the disciplinary rules prohibit a lawyer from submitting to the control of others in the exercise of the lawyer's judgment. EC 3–4 also reminds lawyers that "[p]roper protection of members of the public demands that no person be permitted to act in the confidential and demanding capacity of a lawyer unless he is subject to the regulations of the legal profession."

■ We agree with the commission that in one way or another Baker violated DR 3–101(A), EC 3–1, EC 3–3, and EC 3–4. From our review of the record, we see Voegtlin's seminars, his newsletters, and his referrals to Baker as nothing more than a scheme on Voegtlin's part to reap substantial fees. Indeed, he targeted clients having estates in excess of $600,000. The scheme worked because Voegtlin preached through his seminars and newsletters that clients should use a living trust because our probate system "takes too long and is too expensive." Voegtlin controlled the whole process from the initial interview to the final meeting when the clients executed the documents in his office. He did so by recommending the living trust, the necessary tailored documents to effectuate it, and a lawyer who he believed would not counsel against his advice. In fact, when Voegtlin sold clients on a living trust, Baker never once counseled against using it.

Instead of discouraging Voegtlin from these actions, Baker actually encouraged them in a number of ways. First, Baker allowed Voegtlin to exercise the professional judgment Baker should have exercised. Second, Baker allowed Voegtlin to act in a confidential capacity with the clients who were referred to Baker. Third, Baker furnished Voegtlin with forms to be used at his seminar. Fourth, Baker accepted approximately 100 referrals from Voegtlin.

Last, Baker gave Voegtlin advice on his newsletters.

Our experience with "living trusts" teaches us that they may be a very poor substitute for probate. Unlike probate fees, the fees charged by nonlawyers like Voegtlin who tout living trusts are not subject to court scrutiny. Lack of court scrutiny can easily lead to unnecessary and excessive fees.[1] The point is whether a living trust is appropriate in a given case calls for the exercise of independent professional judgment by a lawyer.

## II. Engaging in Conflicts of Interest.

The commission found that Baker permitted Voegtlin to influence his professional judgment in providing legal services to clients referred to Baker, resulting in a conflict of interest.

This finding is predicated on alleged violations of DR 5–107(B) and EC 5–1.

DR 5–107(B) provides:

A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services.

(Emphasis added.)

EC 5–1 provides:

The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.

(Emphasis added.)

The commission found sufficient evidence to establish a violation of DR 5–107(B) and EC 5–1. We agree.

We have already found that Voegtlin, not Baker, exercised professional judgment as to the appropriateness of a living trust and the particular documents necessary to effectuate it. We have also referred to the reasons why Voegtlin promoted living trusts. All of this is another way of saying that Baker permitted Voegtlin to "direct or regulate his professional judgment" in rendering legal services to the referred clients. DR 5–107(B).

All of this is also another way of saying that Baker permitted Voegtlin's desires to "dilute [Baker's] loyalty to his client[s]." EC 5–1. Like the commission, we find that the prospect of receiving additional referrals constituted the "compromising influences" mentioned in EC 5–1. The number of referrals was many—approximately 100 in all. And the fees generated by them were substantial—approximately $40,000 in total. It is significant to us that Baker came to eventually realize that he was the only lawyer receiving these referrals, and that fact bothered him.

## III. Improper Referrals.

The commission found that Baker accepted improper referrals in violation of formal opinion 90–32. As we said earlier in division I(B) of this opinion, the referrals were one way Baker aided Voegtlin in the unauthorized practice of law. We offer no opinion on the validity of formal opinion 90–32. We think it would be inappropriate to peg an ethical violation on this opinion for several reasons. First, the opinion is based in part on a disciplinary rule that we hesitate to say has any application to this case. Second, although we express no opinion one way or the other, we hesitate to approve the practice of charging an attorney with the violation of a formal opinion. Last, the referrals were inextricably intertwined with the unauthorized practice of law issue. Any discipline resulting from

1. Recent action taken by the Illinois attorney general has focused on these potentials for abuse. He has sued a group selling living trusts kits to elderly people in Illinois. He alleges that the group has engaged in the unauthorized practice of law and has violated the state's consumer fraud law. Among other things, he alleges that the group is charging as much as $2999 for services which could be obtained at a much lower cost. He has characterized the group's actions as "using a 'one-size-fits-all' approach, [selling] living trusts to individuals for whom the documents [are] neither appropriate nor necessary." David N. Anderson, AG Joins ISBA's 'Living Trust' Battle, Ill.St.B.Ass'n B.News, October 15, 1992, at 1.

accepting improper referrals should therefore be limited to the allegations of aiding in the unauthorized practice of law.

### IV. *Discipline.*

Until this court speaks, generally it is not clear what constitutes the practice of law in a particular set of circumstances. We agree with one writer's assessment of this problem:

> Because of the marked lack of precision in the definition of unauthorized practice, it would be intolerable to hold a lawyer to a prophet's standard of clairvoyance about unclear areas of practice in a jurisdiction.

C.W. Wolfram, *Modern Legal Ethics* 846 (1986). What is implicated here is a potential issue of fair notice. Our rules on the unauthorized practice of law resolve this problem of fair notice by authorizing the UPC to seek an injunction if it believes a person is engaged in the unauthorized practice of law. *See* Unauthorized Practice of Law Commission Rule 118A.1. Such a person will then be on notice of what specific conduct is prohibited before that person is punished. These reasons, in part, convince us that any discipline here in excess of a reprimand would not be appropriate.

Four additional facts enter our decision on discipline here. First, Baker has for many years enjoyed an excellent reputation as an active practicing lawyer. Second, Baker fully cooperated with all investigations related to the complaint. Third, no client referred by Voegtlin (1) complained about any living trust or other documents Baker prepared or (2) suffered any financial loss based upon these documents. Last, Baker sought clarification from the committee before the complaint was filed and received no satisfaction. Instead, the committee filed the complaint.

We do not condone Baker's behavior in this matter. He was ill-advised to continue accepting referrals from Voegtlin when it became apparent that such conduct might be improper. What he should have done is to follow the old ethics adage, "if you have doubt, don't do it." Baker did the opposite. We view his past professional judgment as misguided, and we expect him to guard against even the appearance of impropriety in his future professional relationships.

We reprimand Baker for aiding Voegtlin in the unauthorized practice of law and for allowing Voegtlin to direct or regulate Baker's professional judgment in rendering legal services to Baker's clients.

Costs are assessed to Baker under Iowa Supreme Court Rule 118.22.

ATTORNEY REPRIMANDED.