Terri BERGANTZEL, Appellee,

v.

Jan R. MLYNARIK, Appellant.

No. 98–0530.

Supreme Court of Iowa.

Nov. 16, 2000.

Randall J. Shanks of Shanks Law Firm, Council Bluffs, for appellant.

Terri Bergantzel, Council Bluffs, pro se.

TERNUS, Justice.

The appellee, Terri Bergantzel, brought a small claims action against the appellant, Jan Mlynarik, to recover a contingent fee based on Bergantzel's assistance in negotiating a settlement of Mlynarik's personal injury claim. We granted discretionary review of the district court's affirmance of the small claims judgment allowing such a fee. Because Bergantzel is not a licensed attorney, we hold that the contingent fee contract is against public policy and may not be enforced. Accordingly, we reverse and remand for dismissal of Bergantzel's action.

### I. Scope of Review.

The scope of review of a small claims action depends upon the nature of the case. *See Credit Bureau Enters., Inc. v. Pelo*, 608 N.W.2d 20, 23 (Iowa 2000). The claim in the case before us is for breach of contract, a law action. *See Rogers v. Webb*, 558 N.W.2d 155, 156 (Iowa 1997). Therefore, our review is for correction of errors of law. *See id.* The trial court's findings of fact "are binding if supported by substantial evidence." *Land O'Lakes, Inc. v. Hanig*, 610 N.W.2d 518, 522 (Iowa 2000). In the present appeal, Mlynarik does not challenge the trial court's findings of fact, but rather claims that the court incorrectly applied the law in determining that the contract was enforceable under these circumstances. This court is not bound by the trial court's "legal conclusions and application of legal principles." *Id.*

### II. Background Facts and Proceedings.

The trial court found the following facts. The defendant in this action, Jan Mlynarik, was seriously injured in a motor vehicle accident. He entered into a written contract with the plaintiff, Terri Bergantzel, under which Bergantzel was to "assist in the negotiation with the insurance companies and attorney, if necessary, in the settlement of [Mlynarik's] claim" resulting from the accident. In consideration for this assistance, Bergantzel was to receive fifteen percent of the amount recovered after payment of doctors' bills. The contract stated that Bergantzel was not an attorney and that the payment to her was to cover her expenses only. In the event that the services of an attorney were required, the contract provided that Bergantzel would "either pay for the consultation with an attorney or, if the attorney fees exceed the fifteen percent, [would] forfeit all claims to the settlement money."

It is undisputed that, pursuant to this agreement, Bergantzel negotiated a settlement with the tortfeasor's insurance carrier for the limits of the tortfeasor's policy—$100,000. Her work included locating witnesses, preparing affidavits, making long-distance phone calls, obtaining Mlynarik's medical and school records, obtaining a physician's opinion letter, and communicating with the insurance company. For her work, Mlynarik paid Bergantzel slightly over $12,000, which was fifteen percent of

the recovery after medical expenses were deducted.

Bergantzel then undertook similar efforts to negotiate a settlement with Mlynarik's underinsured motorist (UIM) carrier. Bergantzel obtained a settlement offer from the insurance company for $35,000. She told Mlynarik that if he wanted a larger recovery, he would need to hire an attorney. Mlynarik decided to consult with an attorney and entered into a contingent fee agreement with attorney Randall Shanks. Shanks successfully negotiated a $65,000 settlement with Mlynarik's UIM carrier and received his contingent fee. Bergantzel was also paid her contingent fee, with the exception of $1,650. Bergantzel brought suit against Mlynarik for this sum.

At trial, Mlynarik urged that Bergantzel engaged in the unauthorized practice of law and, therefore, could not recover under their contract. The trial court rejected this defense, stating:

> Bergantzel did not represent Mlynarik in court, nor did she file any pleading on his behalf. The court concludes that her efforts to locate witnesses, prepare affidavits, obtain medical and school records, and talk with insurance companies did not involve "the art of exercising professional judgment" and [did] not constitute the unauthorized practice of law. Bergantzel did not give Mlynarik advice about his rights under the law. She encouraged him to consult with an attorney. She did not hold herself out to be an attorney.

Based on these conclusions, the court entered judgment in favor of Bergantzel for $1,650 plus interest and court costs.

Mlynarik filed an appeal to the district court. *See* Iowa Code § 631.13 (1999). The district court affirmed the decision of the small claims court. Mlynarik then sought discretionary review by this court, which was granted. *See id.* § 631.16.

III. *General Principles Governing Contracts Alleged to be Unenforceable on Public Policy Grounds.*

This court recently reviewed the principles governing claims that a contract is unenforceable on the basis of public policy in *Mincks Agri Center, Inc. v. Bell Farms, Inc.,* 611 N.W.2d 270 (Iowa 2000). In *Mincks,* we adopted the following rule from the Restatement (Second) of Contracts:

> If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if
>
> (a) the requirement has a regulatory purpose, and
>
> (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement.

611 N.W.2d at 275 (quoting Restatement (Second) of Contracts § 181, at 21 (1981) [hereinafter "Restatement"] ).

There is no dispute in the case before us that Bergantzel seeks to recover payment under the contract for her services in negotiating a settlement with Mlynarik's UIM carrier. That leaves three issues for our consideration: (1) Was Bergantzel prohibited from negotiating this settlement because she was not a licensed attorney?; (2) If so, does the attorney licensing requirement have a regulatory purpose?; and (3) Is the interest in enforcement of a contingent fee contract for the performance of legal services by a nonlawyer clearly outweighed by the public policy underlying the attorney licensing requirement? We consider each question separately.

IV. *Was Bergantzel Prohibited From Negotiating a Settlement of Mlynarik's UIM Claim Because She Was Not a Licensed Attorney?*

Iowa Code section 602.10101 states:

The power to admit persons to practice as attorneys and counselors in the courts of this state, or any of them, is vested exclusively in the supreme court which shall adopt and promulgate rules to carry out the intent and purpose of this article.

Pursuant to this authority, the court has adopted rules pertaining to the practice of law, requiring that persons desiring to practice law in Iowa be admitted to the bar. *See* Iowa Sup.Ct. Rs. 100–114. There is no dispute that Bergantzel was not admitted to practice law in Iowa.

That brings us to the most problematic issue in this case: was Bergantzel's negotiation of a UIM settlement the practice of law? Like many other states, Iowa has found it difficult to articulate an "all-inclusive definition of the practice of law." *Comm. on Prof'l Ethics & Conduct v. Baker*, 492 N.W.2d 695, 701 (Iowa 1992); *see also In re Bodkin*, 21 Ill.2d 458, 173 N.E.2d 440, 441 (1961) (stating "it is difficult to state a formula as to what constitutes the practice of law"); *State Bar v. Cramer*, 399 Mich. 116, 249 N.W.2d 1, 7 (1976) (stating "any attempt to formulate a lasting, all encompassing definition of 'practice of law' is doomed to failure 'for the reason that under our system of jurisprudence such practice must necessarily change with the everchanging business and social order' ") (quoting *Grand Rapids Bar Ass'n v. Denkema*, 290 Mich. 56, 287 N.W. 377, 380 (1939)); *Liberty Mut. Ins. Co. v. Jones*, 344 Mo. 932, 130 S.W.2d 945, 954 (1939) (" 'It would be difficult to give an all-inclusive definition of the practice of law, and we will not attempt to do so.' " (quoting *Clark v. Austin*, 340 Mo. 467, 101 S.W.2d 977, 982 (1937))); *In re Opinion No. 26*, 139 N.J. 323, 654 A.2d 1344, 1352 (1995) (" 'What constitutes the practice of law does not lend itself to precise and all inclusive definition.' " (quoting *Auerbacher v. Wood*, 142 N.J. Eq. 484, 59 A.2d 863, 864 (1948))); *Wash. State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n*, 91 Wash.2d 48, 586 P.2d 870, 875 (1978) ("The

'practice of law' does not lend itself easily to precise definition.").

We are not without guidance, however, in our endeavor to determine whether a particular activity is the practice of law. *See Baker*, 492 N.W.2d at 701 (referring to EC 3–5 of the Iowa Code of Professional Responsibility). Such guidance is provided by Ethical Consideration 3–5 of the Iowa Code of Professional Responsibility:

[T]he practice of law includes, but is not limited to, representing another before the courts; giving of legal advice and counsel to others relating to their rights and obligations under the law; and preparation or approval of the use of legal instruments by which legal rights of others are either obtained, secured or transferred even if such matters never become the subject of a court proceeding. *Functionally, the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer.* The essence of the professional judgment of the lawyer is the educated ability to relate the general body and philosophy of law to a specific legal problem of a client; and thus, the public interest will be better served if only lawyers are permitted to act in matters involving professional judgment. Where this professional judgment is not involved, nonlawyers, such as court clerks, police officers, abstracters, and many governmental employees, may engage in occupations that require a special knowledge of law in certain areas. *But the services of a lawyer are essential in the public interest whenever the exercise of professional legal judgment is required.*

Iowa Code of Prof'l Responsibility EC 3–5 (emphasis added).

Based on this ethical consideration, this court in *Baker* concluded that the exercise of professional judgment was at the core of the practice of law. 492 N.W.2d at 701. We distinguished a lawyer's ability to exercise professional judgment from a layperson's use of their knowledge of the law:

When lawyers use their educated ability to apply an area of the law to solve a specific problem of a client, they are exercising professional judgment.... [In law school, lawyers] learn to recognize issues first and then how to solve those issues in an ethical manner, using their knowledge of the law. *See* EC 3–2 ("Competent professional judgment is the product of a trained familiarity with law and legal processes, a disciplined, analytical approach to legal problems, and a firm ethical commitment."). The practice of law is no different: lawyers determine what the issues are and use their knowledge of the law to solve them in an ethical way. This is the art of exercising professional judgment.

In contrast, nonlawyers who use their knowledge of the law for informational purposes alone are not exercising a lawyer's professional judgment. For example, an abstracter must have knowledge of what constitutes a lien on real estate. An abstracter uses this knowledge, which is legal in nature, when the abstracter shows the lien in the abstract of title. In doing so, the abstracter is simply furnishing the title examiner—a lawyer—information that the lawyer needs in advising the client on the marketability of title. In this scenario, the abstracter is simply furnishing information; the title examiner is exercising professional judgment on a legal question. The abstracter is not practicing law; the title examiner is.

*Id.* at 701–02; *accord Dauphin County Bar Ass'n v. Mazzacaro*, 465 Pa. 545, 351 A.2d 229, 233 (1976) ("Where, however, a judgment requires the abstract understanding of legal principles and a refined skill for their concrete application, the exercise of legal judgment is called for."). Thus, the definitive issue here is whether

Bergantzel's actions required the exercise of professional judgment on a legal issue or question that affected the rights of a third party.[1]

In reviewing Bergantzel's efforts on behalf of Mlynarik, we find her negotiations with the insurance companies of greatest concern. Whether the negotiation of a personal injury settlement is the practice of law is an issue of first impression in this jurisdiction. Therefore, we turn to cases from other states for guidance.

It appears from our review of the case law that courts considering this issue have concluded that the negotiation of a settlement on behalf of the injured party requires the exercise of professional judgment and is, therefore, the practice of law. *See, e.g., In re Bodkin*, 173 N.E.2d at 442; *People ex rel. Chicago Bar Ass'n v. Goodman*, 366 Ill. 346, 8 N.E.2d 941, 944 (1937); *Meunier v. Bernich*, 170 So. 567, 572 (La. Ct.App.1936); *Fitchette v. Taylor*, 191 Minn. 582, 254 N.W. 910, 911 (1934); *Akron Bar Ass'n v. Bojonell*, 88 Ohio St.3d 154, 724 N.E.2d 401, 402 (2000); *Cincinnati Bar Ass'n v. Cromwell*, 82 Ohio St.3d 255, 695 N.E.2d 243, 244 (1998); *Mazzacaro*, 351 A.2d at 234; *Brown v. Unauthorized Practice of Law Comm.*, 742 S.W.2d 34, 42 (Tex.Ct.App.1987); *accord* 16 John A. Appleman and Jean Appleman, *Insurance Law and Practice* § 8649, at 137 (1981) ("generally the courts have held that if a lay adjuster attempts to handle claims on behalf of plaintiffs, or to effect settlements for them, even though litigation is not required, such amounts to the practice of law"); *cf. Unauthorized Practice of Law Comm. v. Jansen*, 816 S.W.2d 813, 814–16 (1991) (holding that public insurance adjusters were not engaged in the practice of law when they merely "document[ed] and present[ed] first-party claims for property damage to insurance compa-

---

1. We do not mean to imply that our articulation of the determinative issue here constitutes an all-encompassing test for what is the practice of law. We will continue, as we have done in the past, to "decide[ ] each case in this area largely on its own particular facts,"

guided, of course, by our prior decisions. *Baker*, 492 N.W.2d at 701; *see also* Iowa Code of Prof'l Responsibility EC 3–5 ("It is neither necessary nor desirable to attempt the formulation of a single, specific definition of what constitutes the practice of law.").

nies," even though they discussed the competing valuations with the in–house insurance adjuster; the court distinguished these activities from the evaluation and presentation of personal injury claims and from the negotiation of settlements). The reasoning of these courts is helpful in analyzing the facts before this court.

In *Mazzacaro*, a county bar association sought to enjoin a licensed casualty adjuster on the ground that the adjuster's representation of tort claimants constituted the unauthorized practice of law. 351 A.2d at 230. The record showed that the adjuster only represented claimants where liability was undisputed. *Id.* In such cases, for a contingent fee, the adjuster investigated the accident, estimated the amount of damages sustained, made a demand upon the tortfeasor or the tortfeasor's insurance company, and attempted to negotiate a settlement. *Id.* Based on these facts, the district court granted the requested injunctive relief and the Pennsylvania Supreme Court affirmed. *Id.* at 230–31. In rejecting the adjuster's argument that his actions did not require the exercise of any legal judgment on behalf of the injured party, the court stated:

> While the objective valuation of damages may in uncomplicated cases be accomplished by a skilled lay judgment, an assessment of the extent to which that valuation should be compromised in settlement negotiations cannot. Even when liability is not technically "contested," an assessment of the likelihood that liability can be established in a court of law is a crucial factor in weighing the strength of one's bargaining position. A negotiator cannot possibly know how

large a settlement he can exact unless he can probe the degree of unwillingness of the other side to go to court. Such an assessment, however, involves an understanding of the applicable tort principles (including the elements of negligence and contributory negligence), a grasp of the rules of evidence, and an ability to evaluate the strengths and weaknesses of the client's case vis a vis that of the adversary. The acquisition of such knowledge is not within the ability of laypersons, but rather involves the application of abstract legal principles to the concrete facts of the given claim. As a consequence, it is inescapable that lay adjusters who undertake to negotiate settlements of the claims of third-party claimants must exercise legal judgments in so doing. . . .

> In sum, we conclude that such third-party claimant representation by lay adjusters constitutes the unauthorized practice of law.

*Id.* at 233–34.[2]

In a similar early case from Louisiana, the Louisiana Court of Appeals held that a lay claims adjuster who undertook to investigate and settle a wrongful death claim was engaged in the unauthorized practice of law. *Meunier,* 170 So. at 572. Like the agreement in the present case, the contract in *Meunier* stated that the adjuster was not a lawyer and, if the adjuster could not obtain a satisfactory settlement offer from the tortfeasor, the claimants were free to engage the services of an attorney. *Id.* at 568–69. The lawsuit arose when the claimants refused to pay the adjuster the contingent fee upon which they had

---

**2.** The court specifically rejected the defendant's argument that its holding would "invalidate[ ] the long-standing use of lay adjusters by insurance companies in ˙negotiating settlements with third-party claimants." The court distinguished the company adjusters this way:

> The insurance company adjuster is an agent of the company hired to investigate and evaluate claims being made against the company. He does not hold himself out to

the public as competent to represent their interests and indeed, only deals with the public from a plainly adversary posture. . . .

. . . .

. . . "When they deal with claimants it is on an adversary basis, not a representative basis implying a fiduciary relation."

*Mazzacaro,* 351 A.2d at 234–35 n. 7 (quoting *Liberty Mut. Ins. Co. v. Jones,* 344 Mo. 932, 130 S.W.2d 945, 960 (1939)).

agreed. *Id.* at 570. In rejecting the adjuster's claim that he was not engaged in the practice of law, the court stated:

> But, [the adjuster] does more than mere investigation work. He undertook, by contract, to enforce, secure, settle, adjust, or compromise whatever claim the Bernichs had arising out of the fatal accident. In this employment, it became necessary for him to examine the facts of the case, and to advise the Bernichs regarding the liability of the [railroad] in damages for the death of their child. Not only did he advise the defendants that liability existed, but he made a lawyer's demand on the railroad company, informing [it] that responsibility had attached to it for the negligent killing of the little girl.
>
> Thus, in the performance of his contract, [the adjuster] had to advise his client concerning the redress of a legal wrong, which advice he was not qualified to impart, because he does not possess the legal training exacted by the Supreme Court.... [H]e is engaged in the business of settling and adjusting personal injury claims, and it is well established that the doing of these acts constitutes the practice of law.

*Id.* at 572 (citations omitted).

■ We agree with the reasoning of these courts that the negotiation of a settlement of an injured party's claim for damages requires the exercise of professional judgment. Here, Bergantzel, in determining the amount of any settlement demand or counteroffer, was required to have "an understanding of the applicable tort [and underinsured motorist] principles ..., a grasp of the rules of evidence, and an ability to evaluate the strengths and weaknesses of [Mlynarik's] case vis a vis that of the [UIM carrier]." *Mazzacaro,* 351 A.2d at 234. The fact that the liability of the tortfeasor may not have been a contested issue at this point, a fact not entirely clear from the record, does not change our conclusion. *See id.* ("Even when liability is not technically 'contested,'

an assessment of the likelihood that liability can be established in a court of law is a crucial factor in weighing the strength of one's bargaining position."); *Brown,* 742 S.W.2d at 42 ("A claim or cause of action for personal injury and/or property damage also involves the issue of damages, and as long as the damage issue is unresolved, the claim is a disputed and contested claim. There [was] ample proof ... that Brown negotiated the amount of damages to be paid on behalf of parties other than himself. This activity required the use of legal skill and knowledge and, thus, constituted the practice of law."). Nor does the fact that Bergantzel did not advise Mlynarik whether to accept the carrier's offer affect our determination. The mere process of negotiating with the insurance company involved legal assessments that required the exercise of professional judgment regardless of whether Bergantzel shared her assessments or evaluations with Mlynarik. By negotiating a settlement on Mlynarik's behalf, Bergantzel was indirectly advising Mlynarik on the settlement value of his claim. *Cf. Brown,* 742 S.W.2d at 41 (holding that adjuster impliedly advised his clients to accept a certain sum in settlement of their claim when he "approved" a settlement). We hold that Bergantzel engaged in the practice of law when she represented Mlynarik in negotiation of a settlement of Mlynarik's UIM claim.

■ This conclusion does not, however, end our inquiry. We must still determine whether Bergantzel's actions were unauthorized. That is because, in other areas, we have permitted nonlawyers to perform tasks that are arguably the practice of law; the preparation of tax returns by accountants is a good example. *See Comm. on Prof'l Ethics & Conduct v. Mahoney,* 402 N.W.2d 434, 436 (Iowa 1987) ("Doing tax preparation and labor negotiation is not necessarily the practice of law and properly may be done by nonlawyers."). The New Jersey Supreme Court has recently

wrestled with this issue and suggested the following analysis:

> [Recent cases in this area] reflect the conclusion that the determination of whether someone should be permitted to engage in conduct that is arguably the practice of law is governed not by attempting to apply some definition of what constitutes that practice, but rather by asking whether the public interest is disserved by permitting such conduct. The resolution of the question is determined by practical, not theoretical, considerations: the public interest is weighed by analyzing the competing policies and interests that may be involved in the case; the conduct, if permitted, is often conditioned by requirements designed to assure that the public interest is indeed not disserved.

*In re Opinion No. 26,* 654 A.2d at 1352. The court also noted that in "determining what is the unauthorized practice of law," "practical considerations and common sense will prevail, not impractical and technical restrictions that may hamper or burden the public interest with no reasonable justification." *Id.* at 1354.

■ In considering Bergantzel's services from this perspective, we conclude that the public interest is not served by allowing laypersons to negotiate settlements on behalf of injured parties. Although the record shows that Bergantzel had experience as a private investigator, her skills as an investigator and her knowledge of the necessary information required to document a claim are far removed from the legal assessments necessary to an evaluation of that claim for purposes of determining a likely recovery from the tortfeasor or UIM carrier. The public is best served, we think, by requiring that licensed attorneys perform this service so that the benefits of their legal education, skills and experience can be used to negotiate a fair settlement with the tortfeasor or the tortfeasor's insurer. From a practical standpoint, we note that such services are readily available to the public from lawyers on a contingent fee basis; thus, there is no need to permit nonlawyers to perform these functions.

Consistent with our conclusions, we hold that Bergantzel was prohibited under Iowa law from rendering the negotiation services required by her contract with Mlynarik because she was not licensed to practice law in this state. We must now determine whether Iowa's attorney licensing requirement is regulatory in nature.

## V. Does the Attorney Licensing Requirement Have a Regulatory Purpose?

■ Individuals licensed to practice law in Iowa must graduate from an accredited law school and must demonstrate proficiency in the practice of law, either by successfully passing the Iowa bar examination or by demonstrating five years of legal practice in another jurisdiction. *See* Iowa Sup.Ct. Rs. 102, 107, 111. In addition, licensed attorneys must complete fifteen hours of continuing legal education each year to maintain their law license. *See* Iowa Sup.Ct. R. 123.3. Finally, lawyers practicing in Iowa must comply with the Iowa Code of Professional Responsibility; their failure to do so may result in a reprimand, a suspension of their license, or a permanent revocation of their license. *See Cornell v. Wunschel,* 408 N.W.2d 369, 377 (Iowa 1987) (stating that "the code of professional responsibility sets the standard for an attorney's conduct in any transaction in which his professional judgment may be exercised"); Iowa Sup.Ct. R. 118.10 (discussing discipline by supreme court). It is also significant that the underlying goal of the licensing and supervision of attorneys is to protect the public from the consequences of unqualified legal advisors. *See Comm. on Prof'l Ethics & Conduct v. Lawler,* 342 N.W.2d 486, 488 (Iowa 1984).

These facts unquestionably demonstrate that the attorney licensing requirement has a regulatory purpose. *Cf. Mincks,* 611 N.W.2d at 277 (holding that grain dealer

licensing statute has a regulatory purpose where the department of agriculture and land stewardship has general supervision over grain dealers and the purpose behind the statutory licensing requirement is protection of the public). We now determine whether "the interest in the enforcement of the [contract] is clearly outweighed by the public policy behind the [licensing] requirement." Restatement § 181(b), at 21.

### VI. *Is the Interest in Enforcement of the Agreement Between Bergantzel and Mlynarik Clearly Outweighed by the Public Policy Behind the Attorney Licensing Requirement?*

■ The Restatement has identified several factors to consider in balancing the competing interests implicated in the enforcement of a contract that violates public policy:

(2) In weighing the interest in the enforcement of a term, account is taken of

(a) the parties' justified expectations,

(b) any forfeiture that would result if enforcement were denied, and

(c) any special public interest in the enforcement of the particular term.

(3) In weighing a public policy against enforcement of a term, account is taken of

(a) the strength of that policy as manifested by legislation or judicial decisions,

(b) the likelihood that a refusal to enforce the term will further that policy,

(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

(d) the directness of the connection between that misconduct and the term.

Restatement § 178(2)-(3), at 6–7.

First, under the available record, we cannot determine whether Bergantzel knew her negotiation of the settlements constituted the practice of law. Given the fact that she had performed under the contract, she certainly expected to be paid. For purposes of our analysis, we assume, without deciding, that this expectation was justified. Second, it appears that Bergantzel will suffer a forfeiture in that she has already rendered her performance and will be denied compensation for those services. *Cf.* Restatement § 181 cmt. c, at 22 ("If the party who has failed to comply with the [licensing] requirement has done nothing by way of preparation or performance, the interest in enforcement of the promise is easily outweighed."). As a final matter, there does not appear to be any ascertainable special public interest in the enforcement of this contract. As noted in *Mincks*, where performance of an activity is illegal, the public interest weighs against enforcement. 611 N.W.2d at 279.

Although the factors just discussed reveal some interest in enforcement, that interest is clearly outweighed by the factors militating against enforcement. The factors weighing against enforcement, as previously stated, include (1) the strength of the public policy against the unauthorized practice of law, (2) the likelihood that refusal to enforce the contract will further that policy, (3) the seriousness of any misconduct involved and the extent to which Bergantzel was culpable, and (4) the directness of the connection between the unauthorized conduct and the contract. *See* Restatement § 178(3), at 6–7.

Our first step is to identify the public policy underlying the licensure requirement. We agree with the Minnesota Supreme Court's discussion of the rationale for regulating the practice of law:

[The] purpose [for which lawyers are licensed as the exclusive occupants of their field] is to protect the public from the intolerable evils which are brought upon people by those who assume to practice law without having the proper qualifications....

. . . .

... The law practice franchise or privilege is based upon the threefold requirements of *ability, character,* and *responsible supervision.* The public

welfare is safeguarded not merely by limiting law practice to individuals who are possessed of the requisite ability and character, but also by the further requirement that such practitioners shall thenceforth be officers of the court and subject to its supervision.... Protection of the public is set at naught if laymen who are not subject to court supervision are permitted to practice law.

*Gardner v. Conway,* 234 Minn. 468, 48 N.W.2d 788, 794–95 (1951); *accord Lawler,* 342 N.W.2d at 488 (noting that the " 'underlying purpose of regulating the practice of law ... is to protect the public against the often drastic and far reaching consequences of [the] inexpert advice' [of unqualified legal advisors]" (quoting *In re Baker,* 8 N.J. 321, 85 A.2d 505, 514 (1951))). We think it is not subject to debate that the public policy underlying the regulation of the practice of law is strong. The importance of the licensing requirement is further evidenced by the fact that a person who assumes to be an attorney and acts as such without authority may be held in contempt of court and fined up to one thousand dollars or imprisoned in the county jail for up to six months, or both. *See* Iowa Code §§ 665.3, .4.

As for the second factor against enforcement, we think that a refusal to enforce the contract will further the public policy evidenced by the attorney licensure provisions. As we noted in *Mincks,* "taking the economic benefit out of contracts that violate [public policy] by holding them unenforceable 'very definitely would promote the public policy.' " 611 N.W.2d at 280 (quoting *Springlake Corp. v. Symmarron Ltd. P'ship,* 81 Md.App. 694, 569 A.2d 715, 722 (1990)).

Turning to the third factor, we find nothing in the record to suggest that Bergantzel knew her actions were unauthorized, yet deliberately proceeded. Nonetheless, it cannot be questioned that the unauthorized practice of law is a very seri-ous matter. Both lawyers and nonlawyers are subject to severe sanctions for such conduct. *See* Iowa Code of Prof'l Responsibility DR 3–101 & EC 3–1 to 3–9 (providing that a lawyer "should assist in preventing the unauthorized practice of law" and providing for the imposition of sanctions for acts that aid in such conduct); Iowa Code §§ 665.3, .4 (providing for fines and imprisonment for acting as an attorney without authority).

The fourth and final factor concerns the nexus between the lack of license and the contract at issue. In the present case, there is an undeniably direct connection. The performance for which Bergantzel seeks compensation is the unauthorized practice of law, conduct that she was prohibited by law from performing. In other words, the unlicensed conduct is not a collateral matter.

Weighing all the factors, we conclude that the interest in refusing to enforce the contract must prevail. The fact that Bergantzel has already performed and, in that sense, Mlynarik will receive a windfall, simply does not outweigh the strong public policy against the unauthorized practice of law. *See Meunier,* 170 So. at 578 (holding that adjuster, who had fully performed, could not recover his contractual contingent fee due to the strong public policy against the practice of law by laypersons). Accordingly, we conclude that the contract is unenforceable.

VII. *Summary and Disposition.*

We hold that Bergantzel's negotiation of a settlement of Mlynarik's UIM claim constituted the unauthorized practice of law. The public policy underlying the attorney licensure requirement dictates that the contract obligating Bergantzel to perform the unauthorized acts is unenforceable. The trial court erred in ruling to the contrary, as did the district court on appeal. Therefore, we reverse the judgment in

favor of Bergantzel and remand this case for dismissal of Bergantzel's claim.

**REVERSED AND REMANDED.**

McGIVERIN, S.J.*, participates in place of SNELL, J., who takes no part.