Robin K. MATLOCK, Appellee,

v.

Jon D. WEETS, Appellant.

No. 93–1529.

Supreme Court of Iowa.

April 26, 1995.

Michael J. Motto and James T. Carlin of Carlin, Hellstrom & Bittner, Davenport, for appellant.

Carol A.H. Freeman of Lane & Waterman, Rock Island, Illinois, for appellee.

Considered by LARSON, P.J., and CARTER, LAVORATO, NEUMAN, and ANDREASEN, JJ.

ANDREASEN, Justice.

This appeal involves the issuance of a temporary and permanent injunction and the court's judgment that the respondent was in contempt for violation of the temporary injunction. We affirm the issuance of the injunctions and annul the writ of certiorari.

## I. *Background.*

Robin Matlock and Jon Weets began dating in October 1991. The relationship lasted only four to five weeks before Robin broke it off. On March 30, 1993, approximately seventeen months after she terminated the relationship, Robin petitioned for an injunction to enjoin Jon from following her, being in the vicinity of her home or her place of employment, or from contacting her in any manner. Submitted with the petition was a sixteen-page affidavit. The remainder of these background facts were included in the statements contained in the affidavit.

A. Shortly after Robin ended the relationship with Jon, he began to noticeably approach, follow, and watch her. He continued to call her and leave presents for her on the back step of her house. She asked him to stop. He then began sending her cards and letters. In January 1992 he also began jogging by her house.

In February 1992 Jon brought some Valentine's Day gifts to Robin's house. He entered the house uninvited, walked over to the kitchen table and laid the gifts down. Robin's mother, who lived with Robin, was at home alone at the time. She was startled and frightened by his entering the house.

In February or March of 1992 Jon began frequently showing up at various places on Robin's way to work, her way home for lunch, her way back to work, and her way home from work. This was especially unusual because Robin's route varied each day of the week. Robin's mother cleaned house in the mornings for different families in the area, and she relied on Robin to drive her to work to a different house each morning. Robin picked her mother up and took her home during the lunch hour. Therefore, Jon's frequent presence along Robin's route during these times required a thorough knowledge of the details of her schedule. The frequent contacts were also suspicious because although Robin had known Jon before they began dating, she had never seen him anywhere other than at the bar he owned.

Robin was unable to vary her own schedule in an attempt to avoid contact with Jon because her mother relied on her for transportation to and from work. She was also restricted in her ability to vary her route because there are a limited number of ways out of her neighborhood. Nevertheless, she attempted to take different routes in an effort to avoid Jon, but he often found her anyway.

During the weekends Jon would pass Robin's house often. He would begin passing her house at 6:30 a.m., passing her house at least four or six times before noon. This caused Robin to fear for her own and her mother's safety. According to Robin, Jon's frequent presence in the neighborhood concerned her neighbor enough that he filed a police report complaining of Jon's behavior. The neighbor feared for the safety of his fourteen-year-old daughter.

Sometimes Jon followed Robin's car or passed her car at a high rate of speed. These acts made Robin feel fearful and

threatened. When Robin saw Jon, she often witnessed him staring at her. Robin felt threatened by his staring.

In August of 1992 Jon sent her some birthday cards, another letter, and a tape. Robin opened the package because the handwriting had been disguised so she did not realize it was from Jon. In this letter he stated:

> I know I am nothing more than an unpleasant, vague, and faded memory of a mistake in your life.... Now I am just completing the cycle for me. You know that everything that happened or didn't happen between us is absolute poetic justice where I am concerned.
>
> ....
>
> Rude, crude, and socially unacceptable former saloon keepers, former civil servants, and former ex-cons sometimes referred to as Hollywood Hayden never die, they just disappear into a magical, mystical, and sometimes inebriated haze as the spirit that ignored age finds itself trapped in the beginnings of twilight time. I deeply miss all the time we never spent together and all the things we never did and all the laughter and happiness we never shared.

After receiving this letter, Robin began feeling greater anxiety and fear for her safety. She spoke with a police officer about the situation. The officer spoke with Jon, and Jon said he would stop following Robin and sending her letters. Shortly thereafter, Jon sent her two more letters. In the first, he was angry with Robin for telling the officer about his behavior. In the second, he promised to stay off a street Robin drove on when leaving her house. The officer talked to Jon again and told him to leave Robin alone, but Jon continued to show up in Robin's presence.

Robin then asked a mutual friend to talk to Jon and ask him to stop. Jon told the friend that everything with Robin was all over and he would not bother her again. He still did not leave her alone.

Robin then contacted the Scott County Attorney. The county attorney spoke with Jon, who was a former client, and told him to stop; but he was concerned that Jon knew just how far he could go and would not stop. He also told Robin he was concerned that Jon would show up at her doorstep and try to commit suicide in front of her because he had attempted a similar act in the past.

B. The court granted a temporary injunction based on the petition and affidavit. While the temporary injunction was in effect, Robin filed an application for citation of contempt alleging violation of the temporary injunction. After a hearing, the court issued a permanent injunction. The court also found Jon guilty of contempt for violating the terms of the temporary injunction on four separate occasions and sentenced him to fifteen consecutive days of incarceration.

■ In this consolidated appeal, Jon appeals the issuance of the injunctions, the terms of the injunctions, and the judgment of contempt. He acknowledges that the appropriate means of challenging the judgment of contempt is by petition for writ of certiorari. Iowa Code § 665.11; Iowa R.Civ.P. 330. We will treat his notice of appeal as a petition for writ of certiorari. See Iowa R.App.P. 304.

II. *Scope of Review.*

■ A request for an injunction invokes the court's equitable jurisdiction. Iowa R.Civ.P. 320. Because the appeal of the injunction is in equity, our review is de novo. Iowa R.App.P. 4. We give weight to the district court's findings of fact, especially when considering the credibility of witnesses, but are not bound by them. Iowa R.App.P. 14(f)(7). In contrast, certiorari is an action at law and our review is not de novo. *Palmer College of Chiropractic v. The Iowa Dist. Court for Scott County*, 412 N.W.2d 617, 619 (Iowa 1987). When a finding of contempt is challenged, the court examines the evidence to insure that proper proof—substantial evidence—supports the judgment of contempt. *Ervin v. Iowa Dist. Court for Webster County*, 495 N.W.2d 742, 744 (Iowa 1993).

III. *Issuance of Injunctions.*

■ Jon challenges the issuance of both the temporary and permanent injunctions. Although the issuance of a temporary injunction generally merges into the permanent injunction and becomes moot, *Foods, Inc. v.*

*Leffler,* 240 N.W.2d 914, 919 (Iowa 1976), we will examine the issuance of each injunction separately because the contempt citation was based only on violations of the temporary injunction.

An injunction "should be granted with caution and only when clearly required to avoid irreparable damage." *Planned Parenthood of Mid–Iowa v. Maki,* 478 N.W.2d 637, 639 (Iowa 1991). A court of equity will not grant injunctive relief "unless it appears there is an invasion or threatened invasion of a right, and that substantial injury will result to the party whose rights are so invaded, or such injury is reasonably to be apprehended." *Hughes A. Bagley, Inc. v. Bagley,* 463 N.W.2d 423, 425 (Iowa App.1990). An injunction is appropriate only when the party seeking it has no adequate remedy at law. *Maki,* 478 N.W.2d at 639. Before granting an injunction, the court should carefully weigh the relative hardship which would be suffered by the enjoined party upon awarding injunctive relief. *Id.*

A. The court granted the temporary injunction based on the affidavit Robin submitted with her petition. *See Kleman v. Charles City Police Dep't,* 373 N.W.2d 90, 95 (Iowa 1985) (affidavits may be considered in determining whether to issue a temporary injunction). The injunction stated:

It is therefore ordered that a writ of temporary injunction shall issue immediately without bond enjoining and restraining the Respondent from approaching within 100 feet of the Petitioner, her place of residence, or her place of employment, and further enjoining and restraining the Respondent from sitting or standing within sight of Petitioner's residence, from passing Petitioner's residence on foot or by vehicle, from following the Petitioner to and from her residence, or from awaiting the Petitioner at any location in the vicinity of her residence, her mother's places of employment, the Petitioner's places of employment, or the Petitioner's usual places of doing business, including Eagle Foods on Locust Street. The Respondent is further enjoined and restrained from taking any action to contact, in person, by telephone, or by mail, the Petitioner or her

family, or from taking any other action to harass the Petitioner.

Jon asserts the issuance of the temporary injunction was improper because he claims the affidavit Robin filed in support of her petition does not establish she was under any threat of irreparable or substantial harm by Jon, the affidavit does not allege any confrontation which placed Robin in fear of her physical safety, and the order granting the temporary injunction does not make specific findings relating to the hardship that would be imposed on Jon as a result of the issuance of a temporary injunction.

Robin's petition alleges that Jon "has constantly followed, pursued, harassed, and written to [Robin] without legitimate purpose, in a manner clearly designed and intended to cause [Robin] great fear for her personal safety and sanity." In her affidavit, Robin states she fears for her own safety and the safety of her mother, that she has sought the assistance of a mental health counselor, and that her constant fear for her personal safety has been a detriment to her mental health. Jon's actions have interfered with many aspects of Robin's life.

The grant or denial of a temporary injunction "rests largely in the sound discretion of the trial court, and we will not ordinarily interfere with such ruling unless there is an abuse of discretion or a violation of some principle of equity." *Kleman,* 373 N.W.2d at 96. Under the circumstances of this case, we find the temporary injunction issued by the court was warranted.

B. After a hearing, the court granted a permanent injunction. The permanent injunction is substantially similar to the temporary injunction. Jon asserts it was improper to grant the permanent injunction for the same reasons he challenges the temporary injunction.

Jon claims he does not intentionally follow Robin, but rather their meetings are coincidental. The district court, however, specifically found Jon's claim not to be credible. The court found his actions are psychologically harassing to Robin and determined that his obsessive behaviors appear dangerous to

a reasonable person. Based on our de novo review, we agree with the court's findings and conclusions.

■■■■ In seeking an injunction, Robin has the burden to show not only a violation of her rights, but also that she will suffer substantial damages unless one is granted. *Myers v. Caple*, 258 N.W.2d 301, 305 (Iowa 1977). The test for issuing an injunction is whether the facts in the case show a necessity for intervention of equity in order to protect rights cognizable in equity. *Maki*, 478 N.W.2d at 639. Robin's counselor testified that Jon's actions are having a negative psychological impact on her. Robin also fears for her own and her mother's physical safety. An actual assault or verbal physical threat is not necessary before behavior reasonably seen to be dangerous may be enjoined. Although courts generally do not issue an injunction for an act which is subject to a penal law, *Maki*, 478 N.W.2d at 639, if the criminal act is connected with the violation of a private right, an injunction may issue, *Bagley*, 463 N.W.2d at 425. The party seeking the injunction must show the inadequacy of the legal remedy. *Maki*, 478 N.W.2d at 639.

Apparently law enforcement had not been persuaded that Jon's behavior constituted a criminal offense. As a result, Robin is unable to invoke protection from the criminal justice system. Money damages will not relieve her of the fear and psychological terror she feels because of Jon's behavior. Her earlier efforts to get him to stop his behavior all failed. Also, Jon has repeatedly promised to leave Robin alone and then failed to follow through on his promise. This shows Jon's inability to change his own behavior without external intervention. Therefore, Robin lacks an adequate legal remedy and is entitled to a permanent injunction.

We also find that the injunction is properly balanced so as not to place an undue hardship on Jon. The inconvenience the injunction imposes on him does not outweigh the harm to Robin it seeks to prevent. *See Myers*, 258 N.W.2d at 305.

IV. *Vagueness/Overbreadth of the Injunctions.*

■■■■ Jon contends both injunctions are vague and overbroad. Because the language of the two injunctions is substantially similar, we will examine them together. Because he lives in the same neighborhood as Robin, Jon claims the injunction prohibits him from engaging in normal daily activities, such as jogging and driving to work. He also asserts that the injunction leaves the determination of whether he is in violation up to Robin's perception of his behavior.

■■■ An injunction should be limited to the requirements of the case. *205 Corp. v. Brandow*, 517 N.W.2d 548, 552 (Iowa 1994). It should also be drawn in a clear, understandable manner. " 'The acts or things enjoined should be definitely specified, and they should be set forth with certainty and clearness so that persons bound by the decree may readily know what they must refrain from doing without speculation or conjecture.' " *Id.* (quoting 42 Am.Jur.2d *Injunction* § 296, at 1095).

We believe the language of the injunctions clearly conveys to Jon what he cannot do. He is supposed to stay away from Robin, her home, and her place of employment. The language is not vague. We do not perceive "a danger that a person of common intelligence would be required to surmise or conjecture at what conduct is or is not proscribed" by the injunction. *See Foods, Inc.*, 240 N.W.2d at 924.

The injunction is drawn narrowly enough to address the harm sought to be redressed. It prohibits only intentional acts by Jon such as approaching, following, and harassing Robin. Also, it does not prevent Jon from going about his daily business.

V. *Contempt.*

■■■■ Jon argues the court's finding of contempt is not supported by substantial evidence that he willfully violated the temporary injunction. Proof of contempt requires a showing that the contemnor willfully violated the injunction. *Ervin*, 495 N.W.2d at 744. A finding of willful disobedience

requires evidence of conduct that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the

rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern whether the contemnor had the right or not.

*Id.* (citation omitted). A finding of contempt must be established by proof beyond a reasonable doubt. *Id.; Phillips v. Iowa Dist. Court for Johnson County,* 380 N.W.2d 706, 709 (Iowa 1986).

 The alleged contemnor has the burden of proof on a defense of inability to comply with the injunction. *Wilson v. Fenton,* 312 N.W.2d 524, 527 (Iowa 1981). Because the defense bears on the issue of willfulness, it allows the alleged contemnor to avoid an adjudication of contempt by proving he made a good faith effort to comply. *Id.* In examining a contempt citation for violating an injunctive order, "we take into consideration the spirit as well as the letter of the injunction to determine if its intent has been honestly and fairly obeyed." *Orkin Exterminating Co. v. Burnett,* 160 N.W.2d 427, 431 (Iowa 1968).

Our task is to determine whether the record supports the district court's determination that the evidence shows beyond a reasonable doubt that Jon's violation of the injunction was willful. *See Ervin,* 495 N.W.2d at 745. The court found Jon willfully violated the terms of the temporary injunction on four separate occasions. On one occasion Jon had approached or awaited Robin at an intersection in the vicinity of her residence and gestured and mouthed words at her. The court specifically found Jon's explanation for his presence at the intersection to be "wholly incredible." On the other three occasions, Jon followed Robin in her car. One time, when she had a male passenger, he followed her for over two miles. On thirty-nine of the ninety-five work days while the temporary injunction was in effect, Robin saw Jon forty-six times. Jon's own records indicated he had seen Robin forty-four times during that time period. He also testified that he had made no effort to change his routine or his schedule to avoid Robin after the temporary injunction was issued. We agree with the district court that Jon's presence in Robin's area during her known travelled routes at scheduled times was not coincidental. Neither was his following her accidental. Jon has not shown a good faith effort to comply with the injunction. We find substantial evidence supports the court's finding that Jon willfully and intentionally violated the terms of the temporary injunction.

We affirm the issuance of the injunctions and annul the writ of certiorari.

**AFFIRMED AND WRIT ANNULLED.**