# IN THE SUPREME COURT OF IOWA

No. 15–1081

Filed April 7, 2017

Amended July 10, 2017

**IOWA SUPREME COURT COMMISSION
ON THE UNAUTHORIZED PRACTICE OF LAW,**

Appellee,

vs.

**RAYMOND WILLIAM SULLINS,**

Appellant.

_____

Appeal from the Iowa District Court for Emmet County, Duane E. Hoffmeyer, Chief Judge.

Disbarred attorney appeals district court order enjoining him from the unauthorized practice of law. **DISTRICT COURT INJUNCTION AFFIRMED.**

Raymond William Sullins, pro se.

N. Tré Critelli of Iowa Supreme Court Commission on the Unauthorized Practice of Law, Des Moines, for appellee.

**WATERMAN, Justice.**

In this appeal, we must decide whether a disbarred attorney engaged in the unauthorized practice of law when he took a partial assignment of a judgment for back-due child support from a friend who owed him money and they both pursued collection in the same court proceedings. Nonlawyers can represent themselves in court to pursue collection on claims they wholly own by assignment. But a nonlawyer cannot represent another party in court. After a bench trial, the district court found this former lawyer engaged in the practice of law because his friend stood to receive part of the recovery on the assigned claim, and he helped her pursue collection of her own claims. We reach the same conclusion on our de novo review of the record and, therefore, affirm the injunction entered by the district court.

### I. Background Facts and Proceedings.

On our de novo review, we find the following facts.

In 2012, Raymond Sullins met Sarita Henricksen, a woman living in Earlham, Iowa. They became friends, and he loaned her between $24,000 and $28,000 by paying her living expenses for six months. This case arises from his efforts to collect money her ex-husband owed her.

We revoked Sullins's license to practice law in 2002. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sullins* (*Sullins III*), 648 N.W.2d 127, 136–37 (Iowa 2002). Sullins had previously received an admonishment, two public reprimands, and a license suspension of one year. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sullins* (*Sullins II*), 613 N.W.2d 656, 656, 657 (Iowa 2000) (per curiam) (suspending license); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sullins* (*Sullins I*), 556 N.W.2d 456, 456, 457 (Iowa 1996) (reprimanding

Sullins and noting prior reprimand and admonishment). When we suspended his license due to trust account violations and neglect of four client matters, we stated Sullins was "unwilling or unable to discharge the duties required in the practice." *Sullins II*, 613 N.W.2d at 656. When we later revoked his license for neglect of another six client matters and additional trust account violations, we stated,

> We must bear in mind the purposes of attorney disciplinary proceedings which include: protecting the courts and the public from persons unfit to practice law, vindicating public confidence in the integrity of our system of justice, assuring the public the courts will maintain the ethics of the profession, and deterring other lawyers from similar misconduct. The evidence clearly shows Sullins should not practice law. His conduct reflects a deep misunderstanding of his obligations as a lawyer and disrespect for this entire profession. We find the seriousness of these violations warrant revocation of his license to practice law.

*Sullins III*, 648 N.W.2d at 136 (citation omitted). Sullins remains disbarred.

In 1989, Sarita and her husband, Jim Henricksen, obtained a divorce in Oklahoma. The Oklahoma decree ordered Jim to pay Sarita child support for their two children, born in 1984 and 1987, respectively. Jim failed to pay much of his child support, resulting in a substantial arrearage. Jim's parents owned farmland in Iowa and died two decades after his divorce. Jim stood to receive a sizeable inheritance. On October 5, 2012, a probate petition was filed in the Iowa District Court for Emmet County to administer Jim's father's estate. Two months later, another probate petition was filed to administer Jim's mother's estate. The combined estates included property valued at over $2.4 million.

In August 2013, Sullins began giving Sarita money for her living expenses after she lost her teaching job. Sullins loaned Sarita money for her mortgage payment, utility bills, car payment, student loan payment,

groceries, medical bills, medication bills, veterinarian bills, and other expenses. Sometimes he paid her bills directly. Sullins estimated he paid Sarita about $2000 monthly. Sullins knew Sarita's ex-husband owed her money. He told Sarita that he wanted an assignment of part of her interest in the support judgment, to repay the money he loaned her or spent on her behalf. Sarita agreed to the assignment. Sarita and Sullins disagree about whether he planned to remit to her amounts collected on the assigned claims above what she owed him.

**A. Proceedings to Secure Child Support Payments.** In October, Sullins and Sarita met with attorney Phil Redenbaugh in Storm Lake about collecting the back-due support payments. Redenbaugh agreed to review the documents Sarita brought and advise her about how to proceed. Because Redenbaugh was a long-time family friend of Sarita, he told her he would not charge for his services. Sullins informed Redenbaugh of his intent to take an assignment and enter the action to secure the funds. Redenbaugh told Sarita she may be able to "join in" whatever Sullins filed. Redenbaugh asked Sullins to send him any documents before filing so he could review them and determine whether he was comfortable with Sarita joining.

Redenbaugh gave Sarita the impression that recovering the back-due child support would be simple. She told Sullins after the meeting she did not "want to be imposing on Phil any more than what [she had] to" and "if it's so easy, why [couldn't she] do it [herself]?" She asked what "join in" meant. Sullins introduced her to Jerry Wieslander, an attorney friend, to help her. Sarita spoke with Wieslander by phone. On October 9, Sarita sent a letter and a copy of the Oklahoma divorce decree to the clerk of Emmet County, claiming a portion of Jim's inheritance. Five days later, the clerk filed a notice of foreign judgment,

captioned "*Sarita Henricksen v. Jim Henricksen,* Emmet County No. TJCV018129." Two months later, Sarita asked the clerk to issue a writ of general execution to the sheriff in the amount of $353,819.10 plus interest. The writ was issued December 30. On the estate executor's application, the court scheduled a "Hearing of Priority of Claims" on March 3, 2014. Shortly before the hearing, the executor requested a continuance until March 17, which the court granted.

Sullins and Sarita filed a number of legal documents on March 3.[1] Each of them signed and filed their respective documents "pro se," unrepresented by counsel.

In the matter of *Henricksen v. Henricksen,* Sarita filed a handwritten, unnotarized document entitled "ASSIGNMENTS OF JUDGMENTS IN CASE #TJCV018129," purportedly assigning to Sullins her support judgments for the years 1987, 1988, and 1989. The filing stated:

> Sarita Henricksen for good and valuable consideration receipt of which is hereby acknowledged assigns the following judgments to Ray Sullins:
>
> All support judgments for 1987, 1989 [sic], and 1989 in the Oklahoma decree in Emmet County Iowa in case #TJCV018129.

The assignment was signed by Sarita but not dated. The document did not mention any release of Sarita's indebtedness to Sullins or what was paid for the assignment.

Sullins the same day filed a typewritten "APPLICATION FOR ORDER UNDER SECTION UNDER SECTION [sic] 252K.305(2)(f) AND (g) CODE OF IOWA" as "assignee of Sarita Henricksen." Sullins sought to

---

[1]Wieslander had died a month earlier on February 2.

levy on real estate Jim was going to inherit. Sarita filed a handwritten document bearing the same caption, including the same error: "APPLICATION FOR ORDER UNDER SECTION UNDER SECTION [sic] 252K.305(2)(f) AND (g) CODE OF IOWA." Sarita joined Sullins's application. Sarita's motion was filed at 10:03 a.m., four minutes before Sullins's motion.

In the estate proceedings, Sullins filed a typewritten "RESISTANCE TO MOTION TO CONTINUE HEARING ON CLAIMS AND REQUEST FOR ORDER" as "assignee of Sarita Henricksen" at 10:08 a.m. This filing incorrectly put a space in the caption, "ES PRO O9643," and used capital "O"s instead of zeros. Three minutes earlier, Sarita had filed a handwritten "RESISTANCE TO MOTION TO CONTINUE HEARING ON CLAIMS AND REQUEST FOR ORDER" bearing the same errors in the caption. Sarita requested to join Sullins's motion.

On March 17, the district court held the hearing of priority of claims under section 252K.305. Sarita did not appear. Sullins reported she attempted to call into the hearing but could not get through. Sullins appeared and claimed the assignment gave him standing to participate in the action. He made arguments in support of both of their claims.

**B. Proceedings Regarding the Unauthorized Practice of Law.** On August 13, the Iowa Supreme Court Commission on the Unauthorized Practice of Law (Commission) filed a complaint in the Iowa District Court for Emmet County pursuant to Iowa Court Rule 37.2. The complaint alleged the Commission had reasonable cause to believe Sullins was practicing law without a license. The Commission alleged Sullins committed the following acts constituting the practice of law:

    a.    The drafting and filing of legal documents in two matters in Emmet County:

  i. In Sarita Henricksen v. Jim Henricksen, Emmet Cnty. No. TJCV018129; and

  ii. In the Matter of the Estate of Darlene Henricksen, Emmet Cnty. Probate Docket ESPR009643

 b. The representation of the legal interests of Sarita Henricksen in the above captioned matters.

The Commission did not contest the validity of Sarita's assignment. However, it pointed out this complaint was not the first instance of Sullins attempting to use assignments to represent another person. Four years earlier, Sullins had received a cease and desist letter from the Commission after obtaining an assigned interest and attempting to use it to represent other parties. *See Daggy v. Mersch,* No. LACV–017595, Ruling on Mot. to Recuse (Iowa Dist. Ct. for Humboldt Cty. filed July 20, 2010).

The Commission requested the district court enter a "permanent injunction prohibiting [Sullins] from engaging in activities which constitute the unauthorized practice of law, including but not limited to the use of legal assignments of interest as a means for representing the legal interests of others." On October 31, the district court held a show-cause hearing pursuant to Iowa Court Rule 37.2(2). The Commission argued the matching incorrect captions and near-simultaneous filings by Sullins and Sarita indicated Sullins either drafted Sarita's filings or allowed her to copy his filings. The Commission asserted Sullins represented Sarita's interests by advising her on the significance of the documents. It also alleged Sullins represented Sarita's interests at the hearing on March 17 because all of his arguments were in support of her interest in the payments. Sullins admitted most of the factual allegations but disagreed they constituted the unauthorized practice of law.

The district court issued a ruling that stated,

> Based on the pleadings and the testimony at the show-cause hearing, it is still unclear whether Sullins advised Sarita on how to draft [her filings]. Thus, pursuant to Rule 37.2(3), the Court will order a bench trial on the issue. However, the pleadings and testimony also fail to substantiate the Commission's claim that Sullins improperly *filed* Exhibits 8 and 10. Thus, the Court will deny the Commission's request for a permanent injunction on that basis.

The district court credited Sullins's explanation for the simultaneous filing times: he had driven Sarita to the courthouse on March 3 and they had filed them together. But the court noted inconsistencies in Sarita's and Sullins's recollections about the drafting of the motions. It also raised concerns that Sullins planned to secure the judgment and remit a portion back to Sarita. Because Sullins could not identify what he paid Sarita for the assignment, the district court could not determine whether the assignment was "less than, equal to, or exceeding the value" of Sullins's expenditures. The court denied the Commission's request for injunction and set the matter for bench trial pursuant to Iowa Court Rule 37.2(3).[2]

On April 16, 2015, the court held a bench trial. Sullins appeared pro se. Sullins and Sarita testified. Sarita testified Redenbaugh had typed the assignment, while Sullins testified it was definitely "not" Redenbaugh, although he could not say who did. Sarita testified Sullins had given her between $24,000 and $28,000, and the assignment was

---

[2]Rule 37.2 provides,

> If it appears that the facts are incapable of being adequately developed at a summary hearing, the matter may be set for trial before that judge, who shall hear the evidence and make findings of fact in an appropriate dispositional order.

*Id.* r. 37.2(3).

intended to repay that debt. But Sarita estimated the assignment was worth about "a third of a million" dollars. Sarita testified she expected to receive funds collected above what she owed Sullins:

> Q. Why would you assign Mr. Sullins that much money if he only paid you $28,000? A. Because I wanted the rest of it.
>
> . . . .
>
> Q. So there is a difference between the $300,000 and the $28,000, isn't there? A. Yes.
>
> Q. But according to this assignment, you assigned Mr. Sullins all of that judgment for those three years? A. . . . [W]ell, then I don't know that this was written correctly then.
>
> Q. Okay. If Mr. Sullins recovered more money than the $28,000, would you expect him to give it back to you? A. Yes.

By contrast, Sullins testified any amounts he collected on the assigned three years were his to keep, including any amount recovered over what she owed him. He testified he selected the years for the assignment after calculating the recovery that would roughly equal what Sarita owed him. He stated Sarita told him, "[I]f it comes out to a little bit more, . . . I'm certainly not going to be concerned." Sullins did not advise Sarita to speak to an attorney before making the assignment. In fact, the assignment entitled Sullins to collect more than Sarita owed him.[3]

---

[3]There is conflicting testimony on the value of the assignment. As noted, Sarita testified the assigned three years were worth about "a third of a million dollars." At the priority hearing in probate court, Sullins testified as follows:

> MR. SULLINS: She assigned to me the child support judgments out of the Oklahoma decree for the years 1987, '88, and '89. And that's in the court file. That assignment—
>
> THE COURT: What years?
>
> MR. SULLINS: 1987, 1988, and 1989.
>
> THE COURT: And how much are those claims for each year?
>
> MR. SULLINS: The child—the child support claims, those judgments are about $4,200 a year, for that which is designated

Sarita testified she drafted the joinders herself based on prior advice from Redenbaugh and Wieslander, and that Sullins advised her as to the joinders' legal significance. She testified she did not look at any document prior to drafting the joinders, including Sullins's filings. Sullins, on the other hand, recalled, "I—I don't like to be in a position of really disputing directly testimony of Ms. Henricksen today, but she did in fact have copies of the motion and the resistance that I had prepared, and she copied those captions because that's exactly what Jerry told her to do."

On May 21, the district court entered an order granting the Commission's request for permanent injunction. Because of the potential "windfall" to Sullins, the district court credited Sarita's explanation that some of the funds Sullins recovered would be remitted back to her. The court "believe[d] Sarita was attempting to get her back

---

specifically child support. Then there are child—strike that. There are day care judgments, as well, which are also child support judgments as characterized in the Oklahoma decree.

The Iowa writ of execution on the judgment indicates that Jim was ordered to pay Sarita $658 monthly. Three years of monthly backpayments at that rate total $23,699 without interest. Simple interest accrued at ten percent annually. *See Lee v. Volkswagen of Am., Inc.*, 743 P.2d 1067, 1069 (Okla. 1987) (quoting Okla. Stat. tit. 12, § 727 (Supp. 1986)). With accrued interest, that amount would have increased to $82,947 by March 2014, when the assignment was filed in probate court.

But the Oklahoma divorce decree filed April 10, 1989, contradicts Sullins's testimony that Jim owed Sarita substantial unpaid child support for 1987–1988 because that decree specifically awarded only $1974 for "temporary arrearage." The decree also awarded $500 for attorney fees and $109 in court costs. Those sums, plus payments for the remaining eight months of 1989 ($658 monthly), total $7849. With accrued interest, the amount Sullins potentially could have collected on the assignment had increased to $28,320 by May 2015, when the district court conducted its bench trial on the Commission's complaint against Sullins. We need not resolve the conflicts in the evidence to specifically determine the value of the assigned claim (the amount Jim owes Sarita for 1987–1989 with accrued ten percent interest) because we find even the lowest amount supported by the evidence exceeds the $24,000-$28,000 Sarita owed Sullins.

child support 'on the cheap' utilizing this assignment and a disbarred lawyer." The court further noted the discrepancies between Sarita's and Sullins's accounts about the drafting of the documents. The district court found,

> Ray was in his assignee capacity taking action to protect, enforce or defend the legal rights of another; namely, Sarita. The court finds he advised Sarita regarding legal matters specifically including, but not limited to, the assignment, prepared court pleadings which he permitted Sarita to join in and made appearances in court on "their" claims.

The court also pointed out that "Ray testified he used his judgment and knowledge of the legal process to project how long it may take for the case to be resolved and money received and balanced that against expenses he may be asked to pay." The court concluded Sullins "engaged in the practice of law" and entered a permanent injunction.

Sullins appealed, arguing the district court erred by (1) allowing the Commission to prosecute claims outside the pleadings, and (2) concluding Sullins engaged in the unauthorized practice of law.

## II. Scope of Review.

"A request for an injunction invokes the district court's equitable jurisdiction." *Iowa Supreme Ct. Comm'n on Unauthorized Practice of Law v. A–1 Assocs.*, 623 N.W.2d 803, 805 (Iowa 2001) (quoting *Sear v. Clayton Cty. Zoning Bd. of Adjustment,* 590 N.W.2d 512, 515 (Iowa 1999)). Our review is de novo. *Id.* Although we are not bound by the district court's findings of fact, "[w]e give weight to" them, "especially when considering the credibility of witnesses." *Matlock v. Weets,* 531 N.W.2d 118, 121 (Iowa 1995). "As difficult as it is to assess credibility of live testimony, it is more difficult to assess credibility from a cold transcript." *In re Marriage of Woodward,* 228 N.W.2d 74, 75 (Iowa 1975) (quoting *Zaerr v. Zaerr,* 222 N.W.2d 476, 477 (Iowa 1974)). Our deference to the district

court is particularly important on close questions of fact. *In re Marriage of Udelhofen*, 444 N.W.2d 473, 474 (Iowa 1989) (deeming deference "especially strong" when "the case turns . . . upon the implications of the words and actions of the parties" because "a trial court, as first-hand observer of witnesses, holds a distinct advantage over an appellate court").

### III. Analysis.

We must decide whether Sullins was representing Sarita in the collection efforts. If so, he engaged in the unauthorized practice of law. In his telling, he was simply pursuing collection on a claim he owned by assignment. The district court found otherwise after hearing the live testimony of both Sullins and Sarita. On the key disputed factual issue, the district court found Sarita more credible than Sullins and found that he was to repay her any amount collected on his assigned claim that exceeded what he had loaned her for living expenses. Based on our de novo review, we agree and affirm the injunction.

We first address whether the Commission's pleadings encompassed the violations found by the district court. We conclude the pleadings adequately notified Sullins of the claims adjudicated. Next, we review caselaw addressing when a nonlawyer pursuing collection on assigned claims in court engages in the unauthorized practice of law. We conclude Sullins crossed the line by pursuing collection for Sarita. Then we address restrictions on drafting and legal assistance by one nonlawyer to another. We conclude Sullins crossed the line by assisting Sarita with her own court filings.

**A. Due Process.** Sullins argues the district court followed an improper procedure because it "sua sponte interjected issues into the proceedings." Sullins argues the Commission's complaint only alleged

Sullins "draft[ed] and fil[ed]" legal instruments for Sarita. The district court nonetheless evaluated whether "Sarita drafted [the filings] . . . at Sullins'[s] direction," or whether "Sullins advised Sarita on how to draft these exhibits." Because the complaint did not allege Sullins "directed" or "advised" Sarita, Sullins contends the consideration of these issues was improper. Sullins further argues the district court should not have considered whether Sullins "engaged in the unauthorized practice by taking Sarita's assignment with the intent to remit part of the recovery to her" because the complaint only alleged he "represent[ed] . . . the legal interests of Sarita." We reject these challenges.

The Commission is charged with "considering, investigating, and seeking the prohibition of matters pertaining to the unauthorized practice of law and the prosecution of alleged offenders." Iowa Ct. R. 38.1. After conducting an investigation into any alleged unauthorized practice of law, the Commission may "initiate an action pursuant to Iowa Ct. R. 37.2." *Id.* r. 38.7(3). Rule 37.2 states,

> **37.2(1)** If the commission has reasonable cause to believe that any person who has not been admitted to practice law within this state is engaged in the practice of law or holding out to the public that the person is qualified to provide services constituting the practice of law in this state, the commission may file a verified complaint with the clerk of the district court in any county in which the unauthorized practice is alleged to have occurred.

> **37.2(2)** The complaint shall be filed with the clerk of the district court, be given a docket number, and be captioned in the Iowa District Court for _____ County. The commission shall be designated as the complainant. The respondent shall be named and designated as the respondent. The complaint shall be presented to the chief judge of the judicial district for entry of an order to be served on the respondent requiring that person to appear before the court and show cause why that person should not be enjoined from such activity. The show-cause hearing shall be held before the chief judge or another judge designated by the chief judge.

*Id.* r. 37.2(1)–(2). The Commission filed a verified complaint in accordance with this rule after investigating Sullins's activities.

"Iowa is a notice pleading state." *Rieff v. Evans*, 630 N.W.2d 278, 292 (Iowa 2001). Only "facts sufficient to apprise the defendant of the incident must be included in the petition in order to provide 'fair notice' of the claim asserted." *Id.* (quoting *Schmidt v. Wilkinson*, 340 N.W.2d 282, 283 (Iowa 1983)). "A petition complies with the 'fair notice' requirement if it informs the defendant of the incident giving rise to the claim and of the claim's general nature." *Rees v. City of Shenandoah*, 682 N.W.2d 77, 79 (Iowa 2004)). A petition need not allege a specific legal theory, so long as it meets the "fair notice" requirement. *Rieff*, 630 N.W.2d at 292.

The purpose of the verified complaint is to set forth "reasonable cause to believe" an individual is engaged in the unauthorized practice of law, sufficient to allow the district court to require the individual to appear at a show-cause hearing. Iowa Ct. R. 37.2(1)–(2). To that end, the Commission concedes the complaint must be more detailed than the typical "notice pleading" used in civil matters. *See GE Money Bank v. Morales*, 773 N.W.2d 533, 537 (Iowa 2009) (interpreting statute requiring a "verified account" and noting that "[i]f . . . the verified account *substantiates the plaintiff's claim*, the court should enter judgment against the defendant" (emphasis added)); *ITT Fin. Servs. v. Zimmerman*, 464 N.W.2d 486, 488 (Iowa Ct. App. 1990) (stating verified complaint must provide the court with "information sufficient to compute the amount to which the creditor claims to be entitled" under Iowa Consumer Credit Code).

This complaint meets the standard of pleading required under rule 37.2 by providing information sufficient to give the court reasonable

cause to believe Sullins engaged in the unauthorized practice of law. It alleged Sullins engaged in the unauthorized practice of law in three particulars: (1) the drafting of legal documents, (2) the filing of legal documents, and (3) the representation of the legal interests of Sarita. It detailed the factual basis for its claims in over twenty paragraphs and submitted twelve exhibits in support. The complaint was notarized. *See, e.g., State v. Phippen*, 244 N.W.2d 574, 575 (Iowa 1976) (construing a verified complaint as one that bears a statement under oath). The Commission's verified complaint provided sufficient information to substantiate its claims.

We also conclude the district court did not sua sponte interject issues into the proceeding. The district court evaluated whether Sullins "directed" or "advised" Sarita about drafting her filings. This falls within the complaint's allegation that Sullins "drafted" documents. Nor was the claim Sullins planned to remit funds to Sarita outside the pleadings; that claim is encompassed within the allegation that Sullins attempted to represent her legal interests. *See Bump v. Barnett*, 235 Iowa 308, 313, 16 N.W.2d 579, 582 (1944) (prohibiting using assignment to render legal services to another). The complaint need not plead specific legal theories to give Sullins fair notice. We find no due process violation.

**B. Sullins Engaged in the Unauthorized Practice of Law.** On our de novo review, we agree with the district court's determination that Sullins engaged in the unauthorized practice of law. Sarita, a nonlawyer, owed Sullins, a disbarred lawyer, between $24,000 to $28,000. She provided him an assignment of her Oklahoma judgment against her ex-husband Jim for three years of child support (1987, 1988, and 1989) that with accrued statutory ten percent interest exceeded the amount Sarita owed Sullins. The assignment was silent as to the consideration

paid and included no language extinguishing Sarita's debt to Sullins. Sarita retained her interest in the Oklahoma judgment for other years. Jim was poised to inherit Iowa farmland from his deceased parents worth several million dollars. Sarita planned to piggyback on Sullins's collection efforts in the probate proceedings and expected to receive any amount Sullins collected above what she owed him. Essentially Sullins represented both Sarita's interest and his own in pursuing collection of the child support Jim owed. Their arrangement was akin to a lawyer working a collection case on a contingent, percentage fee. Sullins thereby practiced law after his license had been revoked.

Our court has the "authority to define and regulate the practice of law" in Iowa. *Iowa Supreme Ct. Comm'n on Unauthorized Practice of Law v. Sturgeon*, 635 N.W.2d 679, 681 (Iowa 2001). Although we have "refrained from attempting an all-inclusive definition of the practice of law," we have stated it includes,

> representing another before the courts; giving of legal advice and counsel to others relating to their rights and obligations under the law; and preparation or *approval of the use of legal instruments by which legal rights of others are either obtained, secured or transferred* even if such matters never become the subject of a court proceeding.

*Comm. on Prof'l Ethics & Conduct v. Baker*, 492 N.W.2d 695, 701 (Iowa 1992) (quoting Iowa Code of Prof'l Responsibility EC 3–5 (emphasis added)). "[P]rofessional judgment lies at the core of the practice of law." *Id.* When lawyers determine "what the issues are and use their knowledge of the law to solve them in an ethical way," they exercise professional judgment. *Id.* When an unlicensed person goes beyond the role of a "scrivener" and engages in analysis of legal information, he or she practices law. *Sturgeon*, 635 N.W.2d at 684.

1. *Representing another's interest by assignment as unauthorized practice of law.* Using an assignment to render legal services to others has long been considered the unauthorized practice of law in Iowa. *See Barnett*, 235 Iowa at 313, 16 N.W.2d at 582. W. Thomas Barnett, a nonattorney, contracted with "various creditors to collect their accounts on a commission basis" by having the creditors assign him the claim and "bringing suit . . . as assignee" on a pro se basis. *Id.* at 309, 16 N.W.2d at 580. On appeal from the district court's injunction, Barnett argued such a practice was authorized. *Id.* at 312, 16 N.W.2d at 582. He noted that statutes allowed "the assignment of a claim or debt and vest[ed] the assignee with the right to maintain action thereon in his own name" and that "a party may try his own case even in a court of record." *Id.* We held using an assignment to secure collection for third parties constituted the practice of law:

> Undoubtedly one might for example engage in the business of buying claims as investments and might take assignments of them to himself and maintain actions thereon in his own name. But when he does not purchase the claims and only takes colorable assignment of them so he may render or cause to be rendered legal service to others and holds himself out as engaged in such practice, it is a quite different matter. In one case he is dealing in property on his own account, in the other he is selling service and merely adopting the guise of an investor to conceal the real nature of his operations.

*Id.* at 313, 16 N.W.2d at 582. We cautioned if Barnett was truly representing himself, his right to proceed pro se was "unquestionable." *Id.* But when he placed his action in his own name "so as to enable him to render service to that other under the pretext of trying his own case," he engaged in the unauthorized practice of law. *Id.* We affirmed the district court's injunction. *Id.* at 318, 16 N.W.2d at 585.

We reaffirmed this principle over sixty years later in *A–1 Associates*, 623 N.W.2d at 803. A–1, a debt collection agency, received assignments from creditors, collected on the debts pro se, and then remitted the recoveries to the creditors after deducting a thirty to fifty percent fee as compensation. *Id.* at 804. We held such assignments constituted the unauthorized practice of law because they involved representation of another's legal interest. *Id.* at 808. A–1 effectively pursued legal claims on its own behalf *and* on behalf of the creditors:

> The assignment form executed by A–1's clients purports to transfer absolutely all right, title, and interest in described accounts receivable owned by A–1's clients. If such instrument actually meant what it said, it would come within the ordinary meaning of assignment—a transfer of the assignor's entire interest or rights in the property. . . .
>
> A–1's claimed status as a bona fide assignee is defeated under this record, however, because the assignment—though absolute in form—is, in fact, a transfer intended primarily to secure payment for services rendered. This is demonstrated by the fact that A–1 pays nothing for the purported "assignment." The letter accompanying the "assignment" confirms that the creditor will receive the proceeds of any recovery less a fixed sum representing A–1's commission for its services. In the case of small claims litigation, those services are indisputably legal in nature.

*Id.* (citations omitted). When an individual uses an assignment and pro se litigant status to represent another, the individual renders legal services and engages in the unauthorized practice of law. *See id.*

Other courts have reached the same conclusion: a nonlawyer cannot use an assignment "as a subterfuge to enable [a party] to indulge his overwhelming desire to practice law, without complying with the requirements for admission to the bar." *Biggs v. Schwalge*, 93 N.E.2d 87, 88 (Ill. App. Ct. 1950); *see also Todd v. Franklin Collection Serv., Inc.*, 694 F.3d 849, 851–52 (7th Cir. 2012) ("By attempting to litigate Fletcher's claims through the guise of an assignment, Todd sought to

practice law without a license."); *In re Brooms*, 447 B.R. 258, 266 (B.A.P. 9th Cir. 2011) ("If Jorgenson retained any interest in the Judgment or any recovery thereon, then Carter was engaging in the unauthorized practice of law by representing another party when he is not a licensed attorney."), *aff'd*, 520 F. App'x 569 (9th Cir. 2013); *In re UPL Advisory Op. 2002–1*, 591 S.E.2d 822, 823 (Ga. 2004) (per curiam) ("[I]f the purported assignment from the physician is purely for the purpose of debt collection on the physician's behalf . . . , then the assignment is nothing more than a means through which the collector is representing the physician."); *In re Mills*, 23 Haw. 224, 227 (1916) ("[Claims] that were assigned . . . [through an agreement] he would undertake collection of same and if successful pay to the assignor a stated sum . . . constituted an evasion of the judgment of disbarment . . . ."); *Toledo Bar Ass'n v. Ishler*, 339 N.E.2d 828, 830 (Ohio 1975) (per curiam) (stating assignments were a "devious scheme" that was "contrived to circumvent the . . . order of this court indefinitely suspending him from the practice of law").

The problem often arises when a business attempts to circumvent rules requiring corporate representation by assigning its interests to a shareholder, who then proceeds pro se. *See In re Thomas*, 387 B.R. 808, 815 (D. Colo. 2008) (collecting cases "demonstrating that courts will look past legal title to determine whether a *pro se* purported assignee is circumventing rules and statutes requiring that corporations be represented by counsel in legal proceedings"). Here, the district court properly looked behind the assignment and determined that Sullins was effectively representing Sarita because she would receive amounts collected beyond what she owed him. A contrary conclusion would allow Sullins to practice law through the artifice of an assignment.

"Although our state law allows pro se litigants to represent their *own* claims, it does not authorize pro se litigants to prosecute the claims of *others*." *Yulin Li ex rel. Lee v. Rizzio,* 801 N.W.2d 351, 360 (Iowa Ct. App. 2011). In *Rizzio,* the court of appeals held a parent pursuing a loss-of-consortium claim may represent himself, but not his minor child. *Id.* at 359–60. Yulin Li, a nonlawyer, filed a district court lawsuit against a babysitter alleging her negligence injured his son Gordon. *Id.* at 353. His petition included two counts, one for Gordon's injury and pain and suffering, the other for Yulin's loss of "society and services of a healthy child." *Id.* Yulin represented both Gordon and himself, "acting pro se for his own claim and as next friend on behalf of Gordon." *Id.* The court of appeals concluded Yulin engaged in the unauthorized practice of law, stating, "Yulin's action—namely trying a personal-injury case on behalf of his son—required the exercise of professional judgment." *Id.* at 360. Our laws allowing self-representation do not authorize a pro se litigant to exercise professional judgment on behalf of another, even within the same proceeding. *Id.*; *see also Bergantzel v. Mlynarik,* 619 N.W.2d 309, 313 (Iowa 2000) (negotiating an uninsured motorist settlement on behalf of another constituted unauthorized practice of law).

We prohibit unlicensed persons from practicing law for good reason. "[E]very man is entitled to receive legal advice from men skilled in law, qualified by character, sworn to maintain a high standard of professional ethics, and subject to the control and discipline of the court." *Bump v. Dist. Ct.,* 232 Iowa 623, 639, 5 N.W.2d 914, 922 (1942). Securing and litigating assignments that result in recovery for both the assignee and assignor results in the public being cheated, "either by receiving incompetent and unethical advice, or by being served by lawyers who are not disinterested, whose real client is not the person

advised but the entrepreneur furnishing the services." *Id.* (quoting Am. Bar Ass'n, 66 Proceedings of Am. Bar Ass'n 268 (1941)). Such concerns are not implicated when a party has independent, licensed representation. *Hauge Assocs., Inc. v. McGriff*, 666 N.W.2d 151, 152 (Iowa 2003) (per curiam) ("The considerations involving the unauthorized practice of law [with assignments] do not exist in the present case because Hauge Associates, Inc. was, at all times, represented by a licensed attorney."). Nor are those concerns implicated when the assignor retains no right of recovery and assigns all claims against the target of collection. In that scenario, the assignee represents solely his or her own interests and keeps one hundred percent of any recovery. But that is not what we have here.

We also conclude Sullins practiced law by advising Sarita about the effect of her assignment and selecting what years to assign based on his knowledge of accrued child support obligations and interest rates on judgments. *See Office of Disciplinary Counsel v. Tagupa*, No. 26762, 2016 WL 1219536, at *1 (Haw. Mar. 24, 2016) (determining suspended attorney engaged in unauthorized practice by "interpreting relevant statutes and case law, performing legal analysis and developing legal strategies"); *In re Disciplinary Action Against Ray*, 610 N.W.2d 342, 346 (Minn. 2000) (per curiam) (concluding attorney engaged in unauthorized practice while suspended when attorney accompanied friend to court and advised on legal rights); *In re Chavez*, 1 P.3d 417, 424 (N.M. 2000) (per curiam) (holding suspended attorney engaged in practice of law by providing "advice and assistance" (quoting *In re Herkenhoff*, 931 P.2d 1382, 1384 (N.M. 1997) (per curiam)); *Houts v. State ex rel. Okla. Bar Ass'n*, 486 P.2d 722, 725 (Okla. 1971) ("[S]election of forms by an

attorney, filling in the blank spaces, and making no charge for the service constitute[d] practice of law.").

Sullins was not engaged in assignments and debt collection as a business enterprise like the assignees in *A–1* or *Barnett.* But the "definitive issue," is whether Sullins's "actions required the exercise of professional judgment on a legal issue or question that affected the rights of a third party." *Bergantzel*, 619 N.W.2d at 313. Here, the district court credited Sarita's testimony stating amounts Sullins recovered over the debt would be remitted to her. Sarita, therefore, still maintained an interest in the assigned claim. We, too, credit her testimony on that issue. The assignment nowhere provided that Sarita's indebtedness to Sullins was discharged. Every dollar he failed to collect was a dollar she still owed him. Every dollar he collected above what she owed him was money in her pocket. Sullins therefore effectively represented *both* his own interest and Sarita's in pursuing collection from the estates. Each filing by Sullins ultimately aided Sarita in collecting on the judgment. *See Bump*, 232 Iowa at 636, 5 N.W.2d at 920 ("[O]ne who, in a representative capacity, engages in the business of advising clients as to their rights under the law, or while so engaged, performs any act or acts either in court or outside of court for that purpose, is engaged in the practice of law." (quoting *Liberty Mut. Ins. Co. v. Jones*, 130 S.W.2d 945, 954 (Mo. 1939) (en banc)).

Even if Sarita would not receive extra amounts Sullins recovered on his assigned claims, the two remain intertwined in their interests in maximizing the recovery from the estates. Sarita was piggybacking on his collection efforts. She needed a lawyers' expertise to intercept her

ex-husband's inheritance from his parents' estates.[4] Sullins and Sarita effectively had a joint prosecution arrangement that poses potential conflicts of interest. The estates could attempt to buy off Sullins to undermine Sarita's collection efforts. If an estate offered to settle for the exact amount Sarita owed Sullins, would he abandon efforts to collect more? Or if he settled his assigned claims for less than Sarita owed him, would he forgive her remaining indebtedness? Was he continuing to loan her money or pay her bills? The testimony is in conflict on key points, and the key document—the assignment—is silent. Sullins could have navigated around the grey areas by including explicit terms in the assignment that discharged her indebtedness regardless of the amount he collected. He failed to include such a provision. We construe the assignment against Sullins, the disbarred lawyer, not against Sarita, his debtor.

Sullins was already on notice that he was prohibited from using assignments to represent others. Four years before Sarita's assignment, the Commission sent Sullins a cease and desist letter when he engaged in similar misconduct. In *Daggy v. Mersch*, the Daggys asserted civil claims against their farm tenants, the Mersches. After their attorneys withdrew, the Daggys had fourteen days to secure new counsel. No. LACV–017595, Ruling on Mot. to Recuse. The Daggys executed a partial assignment giving Sullins a legal interest in the claim.[5] *Id.* They

---

[4]Sarita could have proceeded with a licensed attorney on a contingent or hourly basis, with the lawyer paid from the recovery. She and Sullins chose to proceed without separate representation through counsel of record for her in the probate proceedings. We agree with the district court's finding that she sought to save money by using a disbarred attorney to represent her interests.

[5]The Daggy assignment is suspiciously similar to Sarita's assignment. The Daggy assignment states, "Mark C. Daggy and Lee Ann Daggy, for good and valuable consideration, receipt of which is acknowledged, do hereby assign a 20% portion of their

then filed a motion to add Sullins to the action, "suggest[ing] that Mr. Sullins will be serving as 'attorney' for Plaintiffs due to the assignment and his claimed status as a 'pro se' party." *Id.* The defendants resisted, claiming "the assignment represents nothing more than a poorly disguised 20% contingent fee arrangement with an unlicensed attorney attempting to get back into the courtroom under the guise of an assignment, masquerading as a pro se litigant." *Id.* The court found the Daggys' attempt to add Sullins as a party was untimely. *Id.* The court further ordered Sullins to recuse himself from the action:

> In the opinion of this Court, to allow Mr. Sullins to proceed under the facts and circumstances as noted would be in total disregard of the earlier decision of the Iowa Supreme Court [revoking Sullins's license] and would further sanction the unauthorized practice of law by a person not licensed to do so within the State of Iowa. This Court will not permit this to happen and so ORDERS.

*Id.*

"We expect lawyers and judges to learn from their mistakes." *In re Krull*, 860 N.W.2d 38, 40 (Iowa 2015). And we expect former lawyers to learn from their mistakes as well. *See id.* Sullins, by means of Sarita's assignment, once again represented another's interest in collection litigation and thereby engaged in the unauthorized practice of law.

2. *Drafting as unauthorized practice of law.* "Giving legal advice, directly or indirectly . . . concerning the application, preparation, advisability or quality of any legal instrument or document or forms thereof" constitutes the unauthorized practice of law. *Baker*, 492 N.W.2d at 702 (quoting *In re Fla. Bar*, 215 So. 2d 613, 613–14 (Fla. 1968)

---

claims in this case to Ray Sullins." Sarita's assignment states "Sarita Henricksen for good and valuable consideration receipt of which is hereby acknowledged assigns the following judgments to Ray Sullins . . . ."

(per curiam)). This includes drafting pleadings and counseling clients on which documents need to be filed. *Sturgeon*, 635 N.W.2d at 683 ("Clearly, Sturgeon counseled clients on which documents they needed to file, and this has been held to be the practice of law."); *Bump*, 232 Iowa at 631, 5 N.W.2d at 918 ("There is no question that the preparation of pleadings . . . by one not a member of a bar constitutes the illegal practice of law."). It also includes the act of drafting a filing for another and allowing that person to submit it under his or her own name. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rauch*, 746 N.W.2d 262, 265 (Iowa 2008) (noting "ghostwriting" for a pro se party could be considered practicing law).

But a party does not practice law when he or she merely assumes the role of a "scrivener." *Sturgeon*, 635 N.W.2d at 684. In " 'determining what is the unauthorized practice of law,' 'practical considerations and common sense will prevail, not impractical and technical restrictions that may hamper or burden the public interest with no reasonable justification.' " *Bergantzel*, 619 N.W.2d at 316 (quoting *In re Opinion No. 26*, 654 A.2d 1344, 1354 (N.J. 1995)). In *Sturgeon*, we drew a line between unauthorized drafting and filling blanks on preprinted forms. 635 N.W.2d at 682. We explained drafting became unauthorized practice when "data entry (either by typewriter or computer) crosses the line between copying written information provided by the client and oral solicitation of the information necessary to fill out the documents selected by the preparer." *Id.* LeRoy Sturgeon helped clients in his office prepare Chapter 7 bankruptcy documents. *Id.* at 680. Sturgeon claimed he "merely typed information, furnished by his clients, into preprinted forms." *Id.* at 682. But Sturgeon did more than that; he "drew on his

knowledge and experience in bankruptcy matters" in representing clients:

> Sturgeon conducted an initial interview to solicit information, which he then typed into the computer. He also advised clients to bring certain information with them to the interview. . . . Clearly, Sturgeon counseled clients on which documents they needed to file, and this has been held to be the practice of law.

*Id.* at 683. We held "Sturgeon's assistance in the preparation of bankruptcy documents went far beyond the role of a scrivener and constituted the unauthorized practice of law. *Id.* at 684.

Considering Sullins's services from this perspective, we acknowledge there is no evidence Sullins physically drafted any filings for Sarita. Sarita testified Redenbaugh or Wieslander instructed her about how to draft her March 3 filings, and she wrote them herself at the courthouse. The record reveals Sarita's filings consisted of the caption and one line in the body, stating she joined Sullins's motions. It is apparent Sarita copied Sullins's captions—typos included. Although Sullins did not physically draft Sarita's filings, he guided her through his own motions, which he suggested Sarita join. He acknowledged advising Sarita with respect to her filings, including the legal effect of joining the 252K motion and the desirability of assigning certain years of her claim. The record shows Sullins went beyond a mere scrivener of legal information. He selected a particular course of action and advised Sarita about its desirability and effects. We believe this invokes the professional judgment ordinarily used by one who is engaged in the practice of law.

**IV. Disposition.**

We affirm the district court's determination that Sullins engaged in the unauthorized practice of law and affirm the district court's injunction.

**DISTRICT COURT INJUNCTION AFFIRMED.**